STATE OF NEBRASKA, APPELLEE, v. MICHAEL ZEMUNSKI,
APPELLANT.

433 N.W.2d 170

Filed December 16, 1988.    No. 87-950.

Patrick T. O'Brien, of Bauer, Galter & O'Brien, for
appellant.

Robert M. Spire, Attorney General, and Susan M. Ugai for
appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN,
and GRANT, JJ.

CAPORALE, J.

Following a bench trial, defendant-appellant, Michael Zemunski, was adjudged guilty of burglary in violation of Neb. Rev. Stat. § 28-507(1) (Reissue 1985). Zemunski's assignments of error combine to urge the view that the district court erred in (1) refusing to allow him to withdraw his counseled waiver of a jury and (2) determining the evidence sufficient to support the charge. We affirm.

This case was called for trial before a jury as scheduled. At that time Zemunski moved for a continuance to the next jury panel on the basis that he had "other matters that complicate the preparation for and readiness for trial at this time." The requested continuance was denied, whereupon Zemunski advised the court personally and through counsel that he wanted to waive a jury. In a colloquy with the court, Zemunski acknowledged he did so freely and voluntarily, acknowledged the presence of a jury prepared to then and there try his case, acknowledged that by waiving a jury he would be waiving the right to a speedy trial, and acknowledged having discussed his rights with his attorney. Zemunski denied being under the influence of alcohol, narcotics, or other "pills," and denied having received any threats or promises from anyone. The district court found on the record "beyond a reasonable doubt [Zemunski] freely, voluntarily, knowingly and intelligently waives his right to a jury trial . . . ." The district court then accepted the waiver of trial by jury and set the matter for a bench trial.

Zemunski's subsequent motions to withdraw his jury waiver were overruled, and the matter proceeded to trial before a judge. The record establishes that on the evening of October 9, 1986, and the early morning following, Lincoln Police Officer Todd Beam, as part of a burglary task force, was working in plain clothes and an unmarked police cruiser. His assignment was to check Lincoln businesses in the area north of O Street and east of 27th Street.

At approximately 1:45 a.m., acting on information overheard on his police radio, Beam went to inspect the Phillips 66 gas station at 70th and Vine Streets. As Beam parked his vehicle in front of the gas station, he looked through the glass

doors of the service bay area and noticed a shadow moving within the building. After parking the vehicle, Beam approached the building on foot and "observed a white male party inside the gas station. He was crouched down walking in the, oh, in the area along which would be the west wall of that service bay area." Beam was approximately 10 feet from the shadowy man at that time. A moment later, the man straightened up and looked Beam in the face, at which time Beam got a "very good" look both at the man's face and at his clothing, as the bay area was well lighted. Beam described the man as having dark brown or black, somewhat curly and longish hair and as wearing a windbreaker, blue jeans, and dark shoes. Moreover, Beam recognized the man as Zemunski, whom Beam had known in high school.

Zemunski immediately turned and ran to the rear of the gas station, triggering its alarm system. Beam thereupon circled around the west side of the building to apprehend Zemunski, but Zemunski beat Beam to the back door and ran out while Beam was yet 15 feet away. Beam then identified himself as a police officer and ordered Zemunski to halt, but Zemunski instead ran to the east, away from Beam.

Beam chased Zemunski across Vine Street, through a church parking lot on the southeast corner of 70th and Vine, and into a residential area beyond, where he lost sight of Zemunski. The entire chase lasted 20 to 30 seconds, in Beam's estimation. Beam radioed to his dispatcher the intruder's last observed position and direction of flight, and several other officers soon joined Beam in the area, searching for Zemunski.

Lincoln Police Officer Leo Nissen was also working the special plainclothes burglary detail on the morning of October 10, 1986. At 1:45 that morning, he heard Beam's radio transmission and joined the search, taking up a position at 73d and Vine Streets, facing southwest. After about 15 minutes, Nissen saw a person enter the Vine Street area from midblock, walking rapidly. Nissen moved his vehicle toward the man, who began running away. Nissen gave chase in his vehicle, apprehending Zemunski near Meadow Lane School.

Ten minutes after Beam lost sight of Zemunski, he learned that one of the searching officers had apprehended a suspect

near Meadow Lane School. Beam went there, observed Zemunski in the back seat of a patrol vehicle, and positively identified him at the scene as the person Beam had seen in the gas station. At this time Zemunski appeared winded, and was breathing heavily and perspiring; he was wearing clothes which matched Beam's earlier description.

Beam then returned to the gas station to help complete the investigation. Outside, Beam observed fresh, moist footprints on the lid of a dumpster near the rear wall of the gas station. The footprints disclosed "a fine pattern of kind of zig-zagged lines," a pattern which matched the soles of the shoes Zemunski was wearing when apprehended.

In the back office area of the gas station, Beam observed a vinyl gun pouch and firearm setting on an office chair and a crowbar and sledge hammer on the floor beside the chair, all of which he took into custody. The back door of the gas station appeared not to have been forced open.

William Masters, the owner of the gas station, was summoned to the station and found the front door locked upon his arrival. He testified that the sledge hammer and revolver found in the back office were normally secured at other gas station locations, and had been so secured when he left the gas station at 6 p.m. the preceding day. Masters also testified that he had never before seen the slightly damaged crowbar found on the floor in the back office; that the back door, normally braced closed with 2-by-4 lumber, was ajar when he arrived; that a skylight above the service bays had been opened; and that a garden hose, not his own, hung from the open skylight to the floor, something neither Masters nor his employee Mark Allensworth had ever seen before. However, the gas station safe was intact, apparently untouched, and no personal property was missing.

Allensworth had closed the gas station at 8 p.m. the preceding evening. When he left the gas station shortly after 8 on October 9, 1986, there was no hammer or crowbar on the floor of the back office and nothing on the chair in the office.

In court, Beam identified Zemunski as the person Beam had seen in the gas station. Zemunski produced as an alibi a woman with whom he was living at the time of trial, who testified that

she had spent the evening of October 9, 1986, until "1, 1:30" of the following morning, with Zemunski at a restaurant in Lincoln, discussing her credit problems. However, on cross-examination, she admitted that she was "not really positive about the date."

Zemunski took the stand in his own defense, testifying that he had met the alibi witness at the restaurant on October 9, 1986, and had remained there with her until the early morning hours of October 10. According to Zemunski, after leaving the restaurant, he drove to the area of 56th and Fremont Streets to the home of his wife's friend, thinking his wife might be visiting there. His wife's vehicle not being there, Zemunski headed home, but encountered car trouble and was forced to park the vehicle off Vine Street on East Eldora Lane, approximately three-quarters of a block from a public telephone located in the Meadow Lane Shopping Center at 70th and Vine Streets, and three blocks from his home. After checking the vehicle and failing to restart it, Zemunski walked to the public telephone in the shopping center and called his wife, but she was not at home at that time.

Zemunski then started back toward his vehicle, at which point the gas station alarm sounded, as the result of which, according to Zemunski, he "was startled. I tripped and fell and then I got up and I ran." Zemunski ran along the route outlined in the testimony of Beam, because that was the shortest route back to his vehicle. Zemunski explained his actions thus:

> Well, with a criminal record, I thought no matter whether it was a false alarm or whatever, I would be to blame for no matter what it was. I had been asked on several different occasions by police officers what I was doing out or where I was the night before on a few different occasions, and I figured, well, I'll just always be branded as someone who has the potential to do things illegally.

Zemunski, who testified he saw no one chasing him, stopped running after a time and stood still, trying to catch his breath. Eventually, a police cruiser came upon the scene, and Zemunski again started running. He was subsequently apprehended as outlined above. Zemunski denied having been inside the subject gas station that evening and stated he was not the man Beam

had seen there.

As to the first assignment of error, it has long been the rule that the right to trial by jury is personal and may be waived by a criminal defendant. *State v. High,* 225 Neb. 690, 407 N.W.2d 776 (1987), citing *State v. Carpenter,* 181 Neb. 639, 150 N.W.2d 129 (1967). A voluntary waiver of this right must be express and intelligent. *State v. Bishop,* 224 Neb. 522, 399 N.W.2d 271 (1987), *cert. denied* 484 U.S. 924, 108 S. Ct. 285, 98 L. Ed. 2d 246 (citing *State v. Miles,* 202 Neb. 126, 274 N.W.2d 153 (1979)).

The record establishes that the district court clearly and carefully informed Zemunski of his rights and of the implications of waiver of trial by jury and that, therefore, Zemunski was knowledgeable at the time of waiver. By his own admission, Zemunski chose to waive his right to jury trial at the time to gain a tactical advantage through delay; thus, he himself established that his waiver was voluntary. Zemunski's waiver was properly received by the district court.

Later, the tactical objective of delaying trial having been achieved, Zemunski sought to withdraw his waiver. Once trial by jury is knowledgeably and voluntarily waived, a defendant has no absolute right to withdraw or revoke the waiver and demand a jury trial. *State v. Kaba,* 217 Neb. 81, 349 N.W.2d 627 (1984). Whether one accused of a crime who has previously waived the right to trial by jury will be permitted to withdraw the waiver is within the discretion of the trial court; there is no error absent an abuse of discretion. *State v. Kaba, supra.*

No abuse of discretion being evident, Zemunski's assignment of error in this connection is without merit.

The second assignment is controlled by the rule that in determining the sufficiency of the evidence to sustain a criminal conviction, it is not the province of the Supreme Court to resolve conflicts in the evidence, pass on the credibility of witnesses, determine the plausibility of explanations, or weigh the evidence; such matters are for the finder of fact, and the verdict must be sustained if, taking the view most favorable to the State, there is sufficient evidence to support it. *State v. Trevino, ante* p. 494, 432 N.W.2d 503 (1988); *State v. Jones, ante* p. 528, 432 N.W.2d 523 (1988); *State v. Bustos, ante* p.

524, 432 N.W.2d 241 (1988); *State v. Swift, ante* p. 373, 431 N.W.2d 643 (1988); *State v. Quiring, ante* p. 535, 432 N.W.2d 243 (1988); *State v. Tatara, ante* p. 279, 430 N.W.2d 692 (1988). Moreover, in a bench trial of a criminal case, the court, as trier of fact, is the sole judge of the credibility of witnesses and the weight to be given their testimony. *State v. Quiring, supra*; *State v. Tatara, supra*.

Section 28-507(1) provides as follows: "A person commits burglary if such person willfully, maliciously, and forcibly breaks and enters any real estate or any improvements erected thereon with intent to commit any felony or with intent to steal property of any value." Evidence of any act of physical force by which the obstruction to entering is removed, such as opening a closed screen door to enter an apartment, is sufficient to prove a breaking under this statute. *State v. Sutton*, 220 Neb. 128, 368 N.W.2d 492 (1985). Intent sufficient to support a conviction for burglary may be inferred from the facts and circumstances surrounding an illegal entry, and no actual theft or asportation of property is required. *State v. Vaughn*, 225 Neb. 38, 402 N.W.2d 300 (1987).

Clearly, the evidence adduced at trial amply supports Zemunski's conviction. Zemunski was observed and recognized within the gas station by Beam. An inspection of the gas station after Zemunski's capture disclosed entry through the previously closed skylight, a search of the back office for valuables which resulted in discovery of the owner's pistol, and a hasty exit through the back door, triggering a burglar alarm. It was for the district court to determine the weight and credibility to be accorded the witnesses, including Zemunski's alibi witness.

Zemunski's final assignment of error is also without merit.

AFFIRMED.

FAHRNBRUCH, J., not participating.