Nebraska Supreme Court Online Library
www.nebraska.gov/courts/epub/
03/04/2016 09:16 AM CST

State of Nebraska, appellee, v.
Steven R. Braesch, appellant.
___ N.W.2d ___

Filed March 4, 2016.    No. S-14-1091.

1. **Jury Trials: Waiver: Appeal and Error.** An appellate court reviews a trial court's ruling on a request to withdraw a defendant's waiver of a jury trial for abuse of discretion.
2. **Motions for New Trial: Appeal and Error.** An appellate court reviews a trial court's order denying a motion for a new trial for abuse of discretion.
3. **Judges: Words and Phrases.** A judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrain from acting, but the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through a judicial system.
4. **Jury Trials: Waiver.** Whether to waive a jury trial is a basic trial decision for which the defendant has the ultimate authority.
5. **____: ____.** To waive the right to trial by jury, a defendant must be advised of the right to a jury trial, must personally waive that right, and must do so either in writing or in open court for the record. And a defendant must waive the right to a jury trial knowingly, intelligently, and voluntarily.
6. **Judges.** A defendant has the right to an impartial judge but does not have the right to have his or her case heard before any particular judge.
7. **Jury Trials: Waiver.** After a defendant validly waives his or her right to a jury trial, the defendant has no absolute right to withdraw the waiver. Whether to permit a defendant to withdraw a valid waiver of the right to a jury trial falls within the trial court's discretion.
8. **____: ____.** Absent a showing of good cause for a delay, a trial court does not abuse its discretion in overruling a motion to withdraw a waiver of a jury trial that is not made until the eve of trial.

9. **Jury Trials: Waiver: Appeal and Error.** Absent plain error, when a party knows of a circumstance that purportedly affected the party's decision to validly waive a jury trial but does not raise the matter until after the trial, an appellate court will not consider a challenge on appeal to a trial court's refusal to grant a new trial on that ground.

10. **Trial: Expert Witnesses: Appeal and Error.** Whether a trial court can decide that an expert opinion is unreliable after admitting it into evidence is a procedural issue that an appellate court decides de novo.

11. \_\_\_\_: \_\_\_\_: \_\_\_\_. An appellate court reviews a trial court's ruling to admit or exclude an expert's testimony for abuse of discretion.

12. **Trial: Expert Witnesses.** Before admitting expert opinion testimony under Neb. Evid. R. 702, Neb. Rev. Stat. § 27-702 (Reissue 2008), a trial court must determine whether the expert's knowledge, skill, experience, training, and education qualify the witness as an expert.

13. \_\_\_\_: \_\_\_\_. Under the framework established by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001), if an expert's opinion involves scientific or specialized knowledge, a trial court must determine whether the reasoning or methodology underlying the testimony is valid (reliable). It must also determine whether that reasoning or methodology can be properly applied to the facts in issue.

14. \_\_\_\_: \_\_\_\_. The requirements of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001), do not preclude a court presiding over a bench trial from admitting an expert's opinion subject to the court's later determination that the opinion is unreliable and should not be credited.

15. **Expert Witnesses.** To be admissible, an expert's opinion must be based on good grounds, not mere subjective belief or unsupported speculation.

16. **Trial: Expert Witnesses.** A trial court should not require absolute certainty in an expert's opinion, but it has discretion to exclude expert testimony if an analytical gap between the data and the proffered opinion is too great.

17. \_\_\_\_: \_\_\_\_. A trial court can consider several nonexclusive factors in determining the reliability of an expert's opinion: (1) whether a theory or technique can be (and has been) tested; (2) whether it has been subjected to peer review and publication; (3) whether, in respect to a particular technique, there is a high known or potential rate of error; (4) whether there are standards controlling the technique's operation; and (5) whether the theory or technique enjoys general acceptance within a relevant scientific community.

18. **Expert Witnesses.** Absent evidence that an expert's testimony grows out of the expert's own prelitigation research or that an expert's research has been subjected to peer review, experts must show that they reached their opinions by following an accepted method or procedure as it is practiced by others in their field.

19. **Evidence: Appeal and Error.** When reviewing the sufficiency of the evidence to support a conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

Appeal from the District Court for Sarpy County: MAX KELCH, Judge. Affirmed.

James Martin Davis, of Davis Law Office, for appellant.

Douglas J. Peterson, Attorney General, and Kimberly A. Klein for appellee.

HEAVICAN, C.J., WRIGHT, CONNOLLY, McCORMACK, MILLER-LERMAN, CASSEL, and STACY, JJ.

CONNOLLY, J.

## I. SUMMARY

On July 13, 2013, the appellant, Steven R. Braesch, shot and killed his father, William Braesch (William), in the sight of Braesch's three nieces. The State claimed his three nieces were within the line of fire. After a bench trial, the court convicted Braesch of first degree murder, using a firearm to commit a felony, and three counts of negligent child abuse. In a motion for a new trial, he claimed that the reassignment of his bench trial to a new judge was an irregularity in the proceedings. Braesch contends that the court erred in failing to conclude that his waiver of a jury trial was invalid because he would not have waived this right with any other judge presiding. Additionally, Braesch argues that the court erred in excluding his expert's opinion regarding his mental state when he killed William and finding the evidence sufficient to support his first degree murder conviction.

Finding no reversible error, we affirm.

## II. BACKGROUND

Braesch's mother, Virginia Braesch (Virginia), testified that Braesch moved away from home in the 1990's but moved back into his parents' home in Gretna, Nebraska, about a year or two before the murder. He was staying in the basement. About 6 weeks before the murder, Braesch had told Virginia that he had AIDS. She said that "off and on," he would lie in bed sick, "like depression or something," but that he would also "be really high and all happy." She and William had decided to ask him to move out because of his moods. She knew that Braesch took many medications, because they were delivered to the house or would come in the mail. She also went with him to Mexico so that he could buy injectable steroids.

On July 13, 2013, William and Virginia's three granddaughters, Braesch's nieces, were at the house for a visit. The oldest one was age 7, and the younger twins were age 5. Virginia said that Braesch had been sick in bed for 6 days and appeared to be depressed. When Virginia took her granddaughters to the basement to trim their hair, Braesch came out of his room angry about the noise. After Virginia took the girls back upstairs, Braesch scared her by cornering her in the bathroom and yelling at her. She walked out of the house and met William in the garage. She asked William to call the 911 emergency dispatch service, but he did not. That confrontation occurred at about 10:30 a.m. Virginia and William took their granddaughters to a wedding and reception later that day and did not return home until about 7:30 p.m.

Virginia began putting some groceries away and making a salad in the kitchen, while William went to change clothes to finish some chores. From where Virginia was working in the kitchen, she could see into the dining room and an enclosed porch that was attached to and mostly open to the back dining room wall. As William was headed to the garage door off the enclosed porch, Braesch came up from the basement stairs off the dining room. William told Braesch that he wanted him to move out of the house within 30 days. Virginia said there was

no physical conflict and Braesch never said a word. She said that Braesch went downstairs to "cool off" and that William just looked at her and shook his head. Braesch immediately came back up from the basement with a gun; Virginia said he reappeared in a matter of seconds. He shot William while William was standing beside the garage door in the enclosed porch. The granddaughters were sitting in a hot tub less than 10 feet from a sliding glass door on the back wall of the enclosed porch.

Virginia did not see a gun because it happened so quickly. But she heard a gunshot and saw that William was in pain. She ran through the living room and out the front door. She got in their car and locked the doors because by then, she could see Braesch on the front deck. He did not have a gun then, but he "didn't look right" to her. She drove to a neighbor's house and asked him to call 911. Within a few minutes, the neighbor led sheriff's officers to the house and saw Braesch sitting outside with his three nieces beside him. Braesch complied with the officers' commands and was arrested without incident.

One of the granddaughters testified. While she was in the hot tub, she could see through the sliding glass door and saw Braesch shooting William. She said that they were yelling at each other about moving and that then Braesch pushed William down and started shooting him. She saw William on the ground beside the sliding glass door. After waiting a few minutes, she climbed over him to look for Virginia in the house. She did not see Virginia in the house when Braesch was shooting William.

Officers found a lever-action, .22-caliber rifle on the dining room table and William's body beside the sliding glass door. "Lever action" means that after every shot, "the action of the rifle has to be manually cycled in order to eject the spent cartridge and feed a new one into the chamber." But numerous rounds can be fired in a matter of seconds.

Crime scene investigators found seven shell casings: one in the dining room and the rest on or around William's body in

the enclosed porch area. The parties stipulated that the casings were fired from the gun that the officers found. An investigator who attended the autopsy testified that she collected five bullets or bullet fragments from five different areas of the body: the abdomen, the right collarbone, the lower spine, the right frontal lobe of the brain, and two from the left scalp. The autopsy report stated that the scalp wounds had gray-black particulate material around the entrances, indicating that William was shot in the head from close range.

## 1. EVIDENCE OF BRAESCH'S MENTAL STATE FROM HIS TELEPHONE CALLS

After officers arrested Braesch, he made two telephone calls from jail that an officer recorded. On July 19, 2013, 6 days after the homicide, Braesch called Virginia. During the conversation, he discussed an insanity defense and told her that "there was nothing premeditated" about the homicide. This colloquy followed:

> Virginia: No. Well, there was. You know what they're going to say?
>
> Braesch: But Mom, before that day, before 5 minutes before it happened, before 2 minutes before it happened, I never gave it a thought—of killing dad.
>
> Virginia: Never?
>
> Braesch: Never.
>
> Virginia: Never have you?
>
> Braesch: I have. Once before, like 6 months ago. Six months ago, yeah. . . . But 6 months ago, I didn't even know how to load a gun.

In a telephone call to a friend on July 22, 2013, Braesch again denied killing William with premeditation:

> Everybody is saying that first degree murder will be pretty tough to— There was honestly nothing premeditated about this. My mom and I were arguing and my dad got in the middle of it. And he was in the wrong place at

the wrong time. I mean I didn't go to work on Wednesday, Thursday, Friday. I was feeling really lousy.

But later in the conversation, Braesch admitted to going downstairs to get a loaded gun:

The thing is, the gun, the gun was loaded. We always keep that gun loaded to kill the cats. . . . I ran downstairs, I grabbed the gun that was loaded. It took seconds. I didn't— They think that I loaded the gun, which is not true . . . . There shouldn't be any indication of that. Because it's not true . . . .

## 2. COURT'S FINDINGS

At the close of the State's evidence, the court overruled Braesch's motion for a directed verdict. During the court's findings from the bench after the trial, it concluded that Braesch's expert's opinion of his mental state when he killed William was not credible. It found Braesch guilty of the charged crimes. Later, it overruled Braesch's motion for a new trial. It rejected his arguments that his waiver of a jury trial was invalid and that the evidence was insufficient to support his convictions on the charges of first degree murder and the three counts of negligent child abuse.

After issuing this order, the court sentenced Braesch to life imprisonment for the murder conviction; 10 years' imprisonment for the use of a firearm conviction, to be served consecutively to the life imprisonment sentence; and aggregate concurrent sentences of 1 year's imprisonment for the negligent child abuse convictions, to be served consecutively to the 10-year sentence for use of a firearm.

## III. ASSIGNMENTS OF ERROR

Braesch assigns that the court erred in (1) failing to conclude that he did not voluntarily and intelligently waive his right to a jury trial or consent to a trial before Judge Max Kelch; (2) excluding his expert witness' opinion that his bipolar symptoms, combined with his recent history of abusing

several substances, interfered with his ability to form voli-
tional intent; and (3) failing to find that the evidence was
insufficient to prove beyond a reasonable doubt that he killed
William with deliberate and premeditated malice.

## IV. ANALYSIS

### 1. REASSIGNMENT OF THE CASE TO A NEW JUDGE WAS NOT A DENIAL OF BRAESCH'S RIGHT TO A JURY TRIAL OR AN ABUSE OF DISCRETION

#### (a) Additional Facts

As relevant to the issues raised on appeal, Braesch sought
a new trial for two reasons: (1) The evidence was insuffi-
cient to support the first degree murder conviction, and (2)
an irregularity in the proceedings occurred. In support of his
irregularity claim, Braesch alleged that he had waived his
right to a jury trial, believing that the trial judge would be
Judge William B. Zastera. Instead, his case was reassigned
to Judge Kelch. Braesch claimed that because of confusion
over who would be the assigned judge, he could not move to
withdraw his plea and "was therefore prevented from a having
a fair trial."

The court allowed the parties to submit affidavits regarding
the alleged irregularity in the proceedings. One of Braesch's
trial attorneys, who had withdrawn from representing Braesch
before the motion for a new trial was heard, stated in an affi-
davit that Judge Zastera's assignment to Braesch's case was an
important consideration in advising him to waive his right to a
jury trial.

The record shows that Braesch waived his right to a jury
trial on April 10, 2014. Judge Zastera set the trial date for
July 15. But on June 23, Judge Kelch was assigned to a pre-
trial hearing because Judge Zastera had a medical emergency.
At the June 24 hearing, Judge Kelch informed the parties
that because of Judge Zastera's medical emergency, the case
had been transferred to him. Braesch and his two attorneys

were present at this hearing. At some unstated time, the parties had a conference with Judges Kelch and Zastera about Judge Zastera's possibly still hearing the case. But on July 2, Braesch's attorney "was again informed" that Judge Kelch would preside.

Braesch did not move to withdraw his plea before the bench trial began on July 15, 2014, with Judge Kelch presiding. Braesch stated that he thought the case would be reassigned to Judge Zastera when he returned to the bench and did not learn until the day before his trial that Judge Zastera was ill again. Braesch said that he would not have waived his right to a jury trial if he had known Judge Kelch would preside and that he waived his right solely because he believed that Judge Zastera would preside. Braesch's trial attorney stated that this sequence of events unfairly limited the time Braesch had to consider the procedural complexities of asking the court to withdraw his waiver and decide whether to do so.

Judge Kelch concluded that Braesch had failed to show any prejudice resulting from the transfer. Instead, he concluded that Braesch's desire for a particular judge was only an attempt to gain a tactical advantage and not a reason to grant a new trial. He further concluded that Braesch had failed to show a valid reason for not moving to vacate the waiver.

### (b) Parties' Contentions

Braesch contends that it would be naive not to recognize that a defendant's decision whether to waive a jury trial is influenced by the judge assigned to his case. So he argues that the last-minute reassignment of his case to a judge with whom he was unfamiliar should be a sufficient reason to conclude that he did not freely, voluntarily, and intelligently waive his right to a jury trial.

The State argues that a motion for a new trial is not the proper vehicle for attempting to withdraw a waiver of a jury trial. Because Braesch did not claim he would not have waived his right to a jury trial unless Judge Zastera presided until after

he was convicted, the State argues that he had waived any challenge to the validity of his plea on this ground.

### (c) Standard of Review

[1-3] We review a trial court's ruling on a request to withdraw a defendant's waiver of a jury trial for abuse of discretion.[1] We also review a trial court's order denying a motion for a new trial for abuse of discretion.[2] A judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrain from acting, but the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result in matters submitted for disposition through a judicial system.[3]

### (d) Analysis

[4,5] Whether to waive a jury trial is a basic trial decision for which the defendant has the ultimate authority.[4] To waive the right to trial by jury, a defendant must be advised of the right to a jury trial, must personally waive that right, and must do so either in writing or in open court for the record.[5] And a defendant must waive the right to a jury trial knowingly, intelligently, and voluntarily.[6]

[6] But Braesch cites no authority for his implicit argument that a defendant's waiver of a jury trial is ineffective if the defendant is not informed that his or her case could be reassigned to a different judge. To the contrary, we have held that a

---

[1] See, *State v. Zemunski*, 230 Neb. 613, 433 N.W.2d 170 (1988); *State v. Kaba*, 217 Neb. 81, 349 N.W.2d 627 (1984).

[2] See, *State v. Tolbert*, 288 Neb. 732, 851 N.W.2d 74 (2014); *State v. Dunster*, 270 Neb. 773, 707 N.W.2d 412 (2005).

[3] *State v. Hill*, 288 Neb. 767, 851 N.W.2d 670 (2014).

[4] See *State v. Iromuanya*, 282 Neb. 798, 806 N.W.2d 404 (2011).

[5] *State v. Russell*, 248 Neb. 723, 539 N.W.2d 8 (1995).

[6] See *State v. Journey*, 207 Neb. 717, 301 N.W.2d 82 (1981).

defendant has the right to an impartial judge but does not have the right to have his or her case heard before any particular judge.[7] Braesch did not claim that Judge Kelch was biased, and he does not argue on appeal that the reassignment prejudiced him. Nor does the court's colloquy with Braesch show that Judge Zastera led Braesch to believe his bench trial would be heard only by him if he waived a jury trial.[8] We have reviewed Braesch's waiver of his right to a jury trial and conclude that it was valid.

[7] After a defendant validly waives his or her right to a jury trial, the defendant has no absolute right to withdraw the waiver. Whether to permit a defendant to withdraw a valid waiver of the right to a jury trial falls within the trial court's discretion.[9]

[8] Some of our cases illustrate that absent a showing of good cause for a delay, a trial court does not abuse its discretion in overruling a motion to withdraw a waiver of a jury trial that is not made until the eve of trial.[10] And many courts have held that a request to withdraw a valid waiver of a jury trial after a trial has commenced is ordinarily untimely.[11]

But we have not set an absolute time limit for a defendant to request a withdrawal of his or her waiver. And our decision in *State v. Halsey*[12] suggests that in limited circumstances, such a request might be appropriate after a trial commences. But even in *Halsey*, we found no abuse of discretion in the court's denial of a new trial. We reached this decision in part because the defendant did not move to withdraw his waiver of a jury

---

[7] See *State v. Harris*, 274 Neb. 40, 735 N.W.2d 774 (2007).

[8] See *Fitzgerald v. Withrow*, 292 F.3d 500 (6th Cir. 2002).

[9] See *Zemunski, supra* note 1.

[10] See, *Kaba, supra* note 1; *Sutton v. State*, 163 Neb. 524, 80 N.W.2d 475 (1957).

[11] See 3 Charles E. Torcia, Wharton's Criminal Procedure § 389 (13th ed. 1991) (citing cases).

[12] *State v. Halsey*, 232 Neb. 658, 441 N.W.2d 877 (1989).

trial or ask for a mistrial until after the trial—instead of when he first became aware of the claimed circumstance that supported his motion to withdraw the waiver.

We recognize that an assigned judge is a factor that defense attorneys may take into consideration when advising their clients whether they should waive a jury trial.[13] But we need not consider the circumstances under which a change in the presiding judge could warrant allowing a defendant to withdraw a waiver of the right to a jury trial. Braesch has not shown good cause for not moving to withdraw his waiver before the trial began.

As stated, Judge Kelch first informed Braesch and his attorneys that the case had been reassigned to him 21 days before the trial was scheduled to begin. Thirteen days before trial, Braesch's attorney was again informed that Judge Kelch would preside. Even if Braesch mistakenly thought that his case might still be reassigned to Judge Zastera again, his attorney knew otherwise. And his attorney did not allege that she failed to discuss this information with Braesch. Braesch admits that he minimally knew the day before trial that Judge Zastera would not preside. Yet, he did nothing to timely assert a claim that he would not have agreed to waive his right to a jury trial with any judge presiding besides Judge Zastera.

[9] We have often held that a party who knows of judicial conduct that is purportedly improper cannot gamble on a favorable result without raising the matter and then complain that the claimed error caused an unfavorable outcome.[14] The same reasoning applies here. Absent plain error, when a party knows of a circumstance that purportedly affected the party's decision to validly waive a jury trial but does not raise the matter until after the trial, we will not consider a challenge on appeal to a trial court's refusal to grant a new trial on that ground. The

---

[13] 6 Wayne R. LaFave et al., Criminal Procedure § 22.1(h) (4th ed. 2015).

[14] See, e.g., *State v. Schreiner*, 276 Neb. 393, 418, 754 N.W.2d 742, 762 (2008).

court's refusal to grant a new trial because of the reassignment of judges was not plain error.

## 2. COURT DID NOT ERR IN CONCLUDING THAT BRAESCH'S EXPERT'S OPINION WAS UNRELIABLE AT THE CLOSE OF EVIDENCE

### (a) Additional Facts

Braesch's only witness was Kirk Newring, Ph.D., a psychologist. Newring testified as an expert about Braesch's mental state on the day of the murder. Newring based his opinion on his review of the following information: (1) sheriff officer reports, including statements of the witnesses and officers; (2) the coroner and autopsy reports; (3) interviews with Braesch, Virginia, the principal of the high school that Braesch attended 25 years earlier, and Braesch's work supervisor; (4) pharmacy records of Braesch's prescribed medications; and (5) Braesch's requests for leave from work.

Newring spoke to Braesch in jail in May 2014 for about 2 hours, and he advised Braesch that if he made any incriminating statements, Newring might have to disclose them. He relied in part on Braesch's statements that while in jail, he had been prescribed Depakote, a mood stabilizer, and was subject to suicide precautions. But he did not review any jail records to confirm the prescription, to learn why it was prescribed, or to review Braesch's conduct in jail. Newring said he did not perform any psychological testing because it was so long after the homicide that testing might not have been informative of Braesch's mental state on the day of the killing. He did not contact any of Braesch's health care providers or counselors because he did not have permission to do so. He stated that Braesch had worked for the same employer for 15 years, had been a supervisor, and was considered a good employee—apart from some attendance problems. If a mental health care provider approved his request for leave, he was approved to take leave for depression.

Newring opined, within a reasonable degree of psychological certainty, that Braesch "met [the] diagnostic criteria" for bipolar I disorder, for substance abuse disorders, and for an anxiety disorder. When Newring was asked if he had an opinion whether Braesch's ability to form volitional intent on July 13, 2013, was compromised, the State objected and moved to voir dire. Newring confirmed that his opinion of Braesch's mental state was based in part on Braesch's voluntary use of the following substances in the weeks leading up to the homicide: Xanax, methamphetamine, alcohol, cocaine, and marijuana. The State then moved to exclude his opinion.

The State argued that to the extent Newring relied on Braesch's voluntary use of intoxicating substances, his opinion was invalid under Neb. Rev. Stat. § 29-122 (Cum. Supp. 2014). Apart from limited exceptions, that statute excludes evidence of intoxication as a defense to a criminal charge or to show that a defendant did not have the requisite mental state. Additionally, the State argued that because Newring did not have a juris doctorate, he lacked the qualifications to opine about legal conclusions. Braesch responded that Newring was not giving a legal opinion and that Newring's opinion about Braesch's substance abuse was only part of his diagnosis.

The court concluded that § 29-122 did not permit a voluntary intoxication defense and that no exception applied. It also concluded that Braesch had failed to show Newring had any understanding of the legal meaning of intent. But it permitted Braesch to reframe his question to exclude any reference to voluntary intoxication.

Newring then testified that he had prepared separate opinions on the effect of Braesch's mental health disorders on his intent. He said that his primary concern was Braesch's bipolar I disorder and believed that Braesch's substance abuse was caused by his bipolar I disorder. When asked for his opinion regarding the impact of Braesch's bipolar I disorder on his volitional intent, the State again objected and asked to voir

dire. Newring conceded that his opinion was partially based on Braesch's impaired decisionmaking and that his substance abuse was a possible contributing factor. He conceded that he did not have a toxicology report to verify Braesch's statements about the substances he had allegedly ingested and that his opinion about Braesch's substance abuse disorders rested on Braesch's self-reporting.

The State renewed its statutory and foundation objections. The court overruled the objections, concluding that the issue was whether to give any weight and credibility to Newring's opinions, an issue that it would decide at the end of the trial. Newring then opined that "separate and distinct" from Braesch's abuse of drugs, his bipolar I disorder "limited his ability to effectively regulate his behavior on that day; that he was experiencing bipolar symptoms, and that limited his ability to make good decisions that day." Newring further stated that with Braesch's reported substance abuse, his impaired decisionmaking "would have been even worse," but that "even without the substance abuse, [his] opinion would probably be the same."

### (b) Court's Findings

In closing argument, Braesch's attorney argued that the evidence showed only a sudden quarrel homicide. The next day, the court stated its findings from the bench.

The court stated that Newring was certainly qualified to perform mental health examinations. But it concluded that Newring's opinion regarding Braesch's ability to form the intent to kill on the day of the homicide was not credible for several reasons.

First, the court noted that Newring's opinion rested on Braesch's self-reported problems and that Newring had not obtained Braesch's medical records or other evidence to corroborate his statements. Second, Newring never explained how his mental health principles, even if they involved intent, related to requirements of Nebraska's homicide statutes. Third,

Newring did not explain the scientific methodology he used to retroactively diagnose Braesch's mental health on the day of the homicide. Specifically, Newring did not explain how Braesch's actions of retrieving a loaded rifle and shooting William five times without further confrontation showed Newring that Braesch was impaired by mental health problems. Nor did Newring attempt to reconcile Braesch's homicidal conduct with evidence that he was not out of control immediately after killing William and was cooperative with law enforcement. Finally, Newring did not explain whether his methodology for determining that Braesch's diagnosis was peer reviewed and how the underlying principles applied to the facts of the case.

### (c) Parties' Contentions

Braesch contends that the court erred in excluding Newring's opinion of how Braesch's bipolar I and anxiety disorders, combined with his recent substance abuse, had affected his mental state on the day of the homicide. He argues that the Legislature's enactment of § 29-122 in 2011 did not change the common law on whether intoxication is relevant to show a defendant did not form specific intent to commit a crime. So he contends that his expert properly considered the combined effect of his bipolar disorder and substance abuse. He contends that the court further erred in admitting Newring's testimony but nonetheless concluding that his opinion was not credible. He argues that the court committed plain error by failing to consider evidence that it had already determined was admissible in its role as the gatekeeper of scientific or specialized evidence.

The State points out that Newring specifically stated that his opinion would be the same even without consideration of Braesch's substance abuse. So it contends that Newring's opinion regarding Braesch's substance abuse added nothing to Newring's opinion of Braesch's mental state on the day of the homicide. The State contends that his opinion

regarding substance abuse lacked a sufficient factual basis because Newring did not state (1) what substances he believed Braesch had ingested or (2) how much he had ingested or when he had done so. Finally, the State contends that Newring's opinion that Braesch's substance abuse had impaired his decisionmaking was insufficient because the evidence showed that he was not wholly deprived of reason because of drug use.

### (d) Standard of Review

[10,11] Whether a trial court can decide that an expert opinion is unreliable after admitting it into evidence is a procedural issue that we decide de novo.[15] We review a trial court's ruling to admit or exclude an expert's testimony for abuse of discretion.[16]

### (e) Analysis

#### (i) The Court Properly Determined the Expert's Opinion Was Unreliable After Admitting His Testimony

We first address Braesch's argument that under the *Daubert/Schafersman*[17] requirements, it was plain error for the trial judge, sitting as the fact finder, to reject an expert's opinion as unreliable when it has already admitted the opinion into evidence. We disagree.

[12,13] Before admitting expert opinion testimony under Neb. Evid. R. 702,[18] a trial court must determine whether the expert's knowledge, skill, experience, training, and education

---

[15] See *Fickle v. State*, 273 Neb. 990, 735 N.W.2d 754 (2007).

[16] See, *State v. Oliveira-Coutinho*, 291 Neb. 294, 865 N.W.2d 740 (2015); *State v. Leibhart*, 266 Neb. 133, 662 N.W.2d 618 (2003).

[17] See, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993); *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001).

[18] See Neb. Rev. Stat. § 27-702 (Reissue 2008).

qualify the witness as an expert.[19] Under our *Daubert/Schafersman* framework,[20] if an expert's opinion involves scientific or specialized knowledge, a trial court must determine whether the reasoning or methodology underlying the testimony is valid (reliable). It must also determine whether that reasoning or methodology can be properly applied to the facts in issue.[21]

But in a bench trial, a trial court is not required to conclusively determine whether an expert's opinion is reliable before admitting the expert's testimony. We have previously considered this issue. In *Fickle v. State*,[22] we determined that the trial court in a bench trial had not abdicated its gatekeeping function or abused its discretion in allowing an expert to testify, subject to the opponent's opportunity to object to the testimony as necessary. We explained that a "trial court may not abdicate its gatekeeping duty . . . in a bench trial, but the court is afforded more flexibility in performing this function."[23] Other courts have similarly concluded that in a bench trial, a court has discretion to admit a qualified expert's opinion even if its admissibility is questionable. The court can then decide after hearing further evidence whether the opinion meets reliability standards and should be credited in deciding disputed questions of fact.[24] We cited some of these cases in *Fickle*.

---

[19] See *State v. Casillas*, 279 Neb. 820, 782 N.W.2d 882 (2010).

[20] See *State v. Herrera*, 289 Neb. 575, 856 N.W.2d 310 (2014).

[21] See *id.*

[22] *Fickle, supra* note 15.

[23] *Id*. at 1006, 735 N.W.2d at 770.

[24] See, e.g., *U.S. v. Brown*, 279 F. Supp. 2d 1238 (S.D. Ala. 2003), *affirmed* 415 F.3d 1257 (11th Cir. 2005), citing *Gonzales v. National Bd. of Medical Examiners*, 225 F.3d 620 (6th Cir. 2000) (Gilman, J., dissenting); *Ekotek Site PRP Committee v. Self*, 1 F. Supp. 2d 1282 (D. Utah 1998); *Bradley v. Brown*, 852 F. Supp. 690 (N.D. Ind. 1994), *affirmed* 42 F.3d 434 (7th Cir. 1994); *City of Owensboro v. Adams*, 136 S.W.3d 446 (Ky. 2004).

[14] Here, the court reasonably concluded that Newring was qualified to testify as an expert on Braesch's mental state. But requiring the parties to conduct a separate evidentiary hearing on the reliability of an expert's opinion before allowing the expert to testify is unnecessary in a bench trial. In a bench trial, the court is not shielding the jury from unreliable evidence. Instead, the court must fulfill its gatekeeper duty *and* decide the ultimate issues of fact in the trial. So we now reiterate the rule applied in *Fickle*: The *Daubert/ Schafersman* requirements do not preclude a court presiding over a bench trial from admitting an expert's opinion subject to the court's later determination that the opinion is unreliable and should not be credited. Accordingly, the question is whether the court properly concluded that Newring's opinion was not credible.

### (ii) Expert's Methodology Was Unreliable

As stated, Braesch contends that the court erred in excluding Newring's opinion of how Braesch's active bipolar I and anxiety disorders, *combined with* his recent substance abuse, had affected his mental state on the day of the homicide. But the record supports the State's argument that Newring conceded that even without considering Braesch's substance abuse, his opinion would be the same. According to Newring, Braesch's substance abuse would have only contributed to the effects of his bipolar I disorder. So there are two primary questions: (1) whether Newring reliably opined that Braesch was experiencing bipolar I symptoms on the day of the homicide, which symptoms limited his ability to effectively regulate his behavior and make good decisions, and (2) whether the fact finder could have properly applied his reasoning and opinion to the facts of the case.[25]

---

[25] See *Herrera, supra* note 20.

[15,16] To be admissible, an expert's opinion must be based on good grounds, not mere subjective belief or unsupported speculation.[26] A trial court should not require absolute certainty in an expert's opinion, but it has discretion to exclude expert testimony if an analytical gap between the data and the proffered opinion is too great.[27]

[17,18] A trial court can consider several nonexclusive factors in determining the reliability of an expert's opinion: (1) whether a theory or technique can be (and has been) tested; (2) whether it has been subjected to peer review and publication; (3) whether, in respect to a particular technique, there is a high known or potential rate of error; (4) whether there are standards controlling the technique's operation; and (5) whether the theory or technique enjoys general acceptance within a relevant scientific community.[28] Absent evidence that an expert's testimony grows out of the expert's own prelitigation research or that an expert's research has been subjected to peer review, experts must show that they reached their opinions by following an accepted method or procedure as it is practiced by others in their field.[29]

Regarding the reliability of Newring's methodology, the court correctly concluded that the evidence failed to establish that Newring reliably determined that Braesch was experiencing the effects of bipolar I symptoms on the day of the homicide. Although Newring provided the sources of information that he relied on, he did not explain the information that he obtained from those sources which led to his opinion. For example, he did not state that any of the medications that Braesch was taking when he killed William were for a

---

[26] *King v. Burlington Northern Santa Fe Ry. Co.*, 277 Neb. 203, 762 N.W.2d 24 (2009).

[27] See *id.*

[28] See *Casillas, supra* note 19.

[29] See *King, supra* note 26.

bipolar I disorder, and he did not consult Braesch's mental health care providers.

Newring also did not explain whether Braesch would have experienced the effects of his bipolar I disorder continually or whether any of the medications Braesch was taking would have diminished those symptoms. Most important, he did not explain what observable effects of a bipolar I disorder led him to believe that Braesch was experiencing those symptoms on the day of the homicide and how he knew that Braesch had a limited ability to regulate his behavior and make good decisions. And no methodology evidence established that subsequent psychological testing would have been irrelevant to whether Braesch was suffering from bipolar I disorder on the day of the killing.

These omissions are not insignificant when a person has been charged with murder. Because Newring had warned Braesch that he might have to report any incriminating statements, Braesch was unlikely to have reported an intent to kill William. And because Braesch had reason to falsify or exaggerate his bipolar symptoms on the day of the homicide, the court was justifiably concerned that Newring appeared to have primarily relied on Braesch's self-reporting of symptoms. Finally, assuming that Newring followed an established methodology for retroactively diagnosing Braesch's mental health disorders, he did not explain those methodologies or show whether they had been peer reviewed or followed by other professionals in his field.

We agree with the court that Braesch's evidence failed to establish the reliability of Newring's methodology in determining that Braesch was actively suffering from bipolar I symptoms on July 13, 2013. In sum, no evidence established a recognized methodology for retroactively diagnosing a bipolar I disorder. And assuming that a recognized methodology exists, Newring provided no specific data that supported his opinion. The court properly exercised its discretion in finding the analytical gap between the data and Newring's opinion

was too great. As stated, the evidence of Braesch's substance abuse was relevant only as a contributing factor to the symptoms of bipolar I disorder. So it would not have changed the court's finding that the underlying bipolar diagnosis itself was unreliable.

### (iii) Court Could Not Apply the Expert's Opinion to the Facts

Regarding the court's ability to apply Newring's opinion and reasoning to the facts of the case, the defect is different but similarly serious. On appeal, Braesch argues that Newring was prepared to testify that Braesch's substance abuse disorder, combined with his bipolar I and anxiety disorders, prevented him from forming the "premeditated volitional intent" required for first degree murder.[30] But the record does not support this claim.

As stated, Newring testified that even without considering Braesch's substance abuse, his opinion of Braesch's mental state on the day of the homicide would have been the same. No offer of proof contradicted that statement. And Newring's opinion was that Braesch's bipolar I disorder limited his ability to make good decisions and effectively regulate his behavior on the day of the homicide. Newring did not opine that Braesch did not intend to kill William or that he could not have formed the specific intent to do so because of his bipolar I symptoms. Nor did he opine that Braesch's bipolar I disorder prevented him from deliberating or premeditating the killing of William.

But to prove first degree murder, the State must show that a defendant killed another person purposely and did so with deliberate and premeditated malice.[31] And to be applicable to these facts, Newring's opinion needed to show whether

---

[30] Brief for appellant at 29.

[31] See *State v. Escamilla*, 291 Neb. 181, 864 N.W.2d 376 (2015).

Braesch could have deliberated and premeditated the killing as we have defined these terms.

Specifically, the deliberation element means not suddenly or rashly, and requires the State to prove that the defendant considered the probable consequences of his act before committing it.[32] The premeditation element requires the State to prove that a defendant formed the intent to kill a victim before doing so, but no particular length of time for premeditation is required. It is sufficient if an intent to kill is formed before the act is committed and not simultaneously with the act that caused the death.[33] But Newring's opinion that Braesch's bipolar I disorder limited his ability to effectively regulate his behavior was too vague to assist the fact finder in determining whether Braesch deliberated or premeditated the killing. The court did not err in concluding that Newring's testimony failed to show how Braesch's impaired decisionmaking, even if true, prevented him from forming the statutory mental state for first degree murder.

### 3. Evidence Was Sufficient to Prove Beyond a Reasonable Doubt That Braesch Killed William With Deliberate and Premeditated Malice

#### (a) Court's Findings

In stating its findings from the bench, the court also set out its factual findings in determining that the State had met its burden to prove Braesch committed first degree murder beyond a reasonable doubt. It stated that despite removing himself from William's presence by going to the basement, Braesch did not leave the house or stay in the basement. Instead, the court found that Braesch had admitted going to the basement to get a gun and that he had done so intentionally and purposefully to kill William. Braesch's intent to kill William was shown by

---

[32] See *id.*

[33] See *id.*

evidence that upon coming up the stairs, he immediately shot William, and that he had then shot William five more times, including shooting him twice in the head at close range. The court stated, "One does not place a deadly weapon next to the human head and pull the trigger, cock the rifle and pull the trigger again without the intent to kill. Additionally, [Braesch] repeated this process at least five times . . . ." The court also found that Braesch was not out of control because he had not shot anyone else.

The court also concluded that the facts of the case did not show a sudden quarrel provocation that would cause a normal person to lose control. It concluded that Braesch had formed the intent and design to kill William, without legal justification, before doing so.

### (b) Standard of Review

[19] When reviewing the sufficiency of the evidence to support a conviction, the relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[34]

### (c) Resolution

Braesch contends that even without considering his expert's testimony, the evidence was insufficient to prove that he killed William with deliberate and premeditated malice. He argues that the evidence at most showed an impulsive, rash act. Under our standard of review, however, a rational fact finder could have found otherwise. This assignment of error is without merit.

### V. CONCLUSION

We conclude that Braesch's waiver of his right to a jury trial was valid despite the court's later reassignment of Braesch's

---

[34] *State v. Irish, ante* p. 513, 873 N.W.2d 161 (2016).

bench trial from Judge Zastera to Judge Kelch. Although the court had discretion to consider his request to withdraw his jury trial waiver, Braesch has waived any challenge on appeal to the court's ruling on this issue by not raising the matter until after the trial was over. Finding no plain error in the ruling, we affirm.

We conclude that in a bench trial, a trial court can properly admit an expert's opinion but reserve ruling on its reliability until the close of evidence. Under that procedure, the court did not err in concluding that the opinion of Braesch's psychological expert on his mental state the day he killed William was unreliable. The evidence failed to establish a recognized methodology for retroactively diagnosing Braesch's mental health or identify the data upon which the expert relied. Additionally, the expert failed to explain how his diagnosis, even if reliable, related to the mental state required for first degree murder.

Finally, we conclude that the court did not err in concluding that the evidence was sufficient to prove beyond a reasonable doubt that Braesch killed William with deliberate and premeditated malice.

Affirmed.