Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
07/10/2024 06:09 PM CDT

State of Nebraska, appellee, v.
Makhi Woolridge-Jones, appellant.

___ N.W.3d ___

Filed May 3, 2024.    No. S-22-934.

1.  **Trial: Expert Witnesses: Appeal and Error.** An appellate court reviews a trial court's ruling to admit or exclude an expert's testimony for abuse of discretion.

2.  **Convictions: Evidence: Appeal and Error.** In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

3.  **Sentences: Appeal and Error.** Absent an abuse of discretion by the trial court, an appellate court will not disturb a sentence imposed within the statutory limits.

4.  **Judgments: Words and Phrases.** An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence.

5.  **Rules of Evidence: Expert Witnesses.** Four preliminary questions must be answered in order to determine whether an expert's testimony is admissible: (1) whether the witness qualifies as an expert pursuant to Neb. Rev. Stat. § 27-702 (Reissue 2016); (2) whether the expert's testimony is relevant; (3) whether the expert's testimony will assist the trier of fact to understand the evidence or determine a controverted factual issue; and (4) whether the expert's testimony, even though relevant and admissible, should be excluded in light of Neb. Rev. Stat.

§ 27-403 (Reissue 2016) because its probative value is substantially outweighed by the danger of unfair prejudice or other considerations.

6. **Expert Witnesses.** Expert testimony should not be received if it appears the witness is not in possession of such facts as will enable him or her to express a reasonably accurate conclusion, as distinguished from a mere guess or conjecture.

7. **Criminal Law: Intent.** A trier of fact may infer that the defendant intended the natural and probable consequences of the defendant's voluntary acts.

8. **Sentences: Appeal and Error.** Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed.

9. **Sentences.** In determining a sentence to be imposed, relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime.

10. ____. The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life.

Appeal from the District Court for Douglas County: James M. Masteller, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Christine A. Mori for appellant.

Michael T. Hilgers, Attorney General, and Jordan Osborne for appellee.

Heavican, C.J., Miller-Lerman, Cassel, Stacy, Funke, Papik, and Freudenberg, JJ.

Papik, J.

Following a jury trial, Makhi Woolridge-Jones was convicted of second degree murder, second degree assault, and

two counts of use of a deadly weapon to commit a felony. The convictions stem from a shooting at a shopping mall that left one man dead and one woman injured. It is undisputed that Woolridge-Jones fired multiple shots, striking the man. On appeal, Woolridge-Jones assigns that the district court erred in excluding expert testimony that would have opined that the initial shot fired by Woolridge-Jones put him in a state of peritraumatic dissociation. Woolridge-Jones also claims that the evidence was insufficient to support his convictions and that his sentences were excessive. We find Woolridge-Jones' arguments unavailing and affirm.

## I. BACKGROUND

### 1. Charges

At a shopping mall at around noon on Saturday, April 17, 2021, Trequez Swift was shot twice. He died later that day. In the same incident, Ja'keya Veland sustained gunshot wounds to her legs, but she survived. Investigators identified Woolridge-Jones, then 16 years old, as one of two shooters. In an interview with police, Woolridge-Jones admitted to shooting Swift but claimed Swift had threatened him.

The State ultimately charged Woolridge-Jones with first degree murder, second degree assault, and two counts of use of a deadly weapon to commit a felony. The matter proceeded to a jury trial.

### 2. Evidence at Trial

#### (a) Shooting

The jury heard evidence that on the day of the shooting, Woolridge-Jones went to the mall with his brother and a friend. Around the same time, Swift, Veland, Steveaun Moten-Roddy, and Marvell Piggie also arrived at the mall. The encounters that followed were captured by surveillance videos, and the parties do not dispute the basic facts or the identities of the key individuals depicted.

According to surveillance video viewed by the jury and to testimony at trial, Swift and Piggie approached Woolridge-Jones' group, and an argument ensued. At one point during the confrontation, Swift turned away, set his shopping bags down, turned to face Woolridge-Jones again, and appeared to have his hands near his waist. Veland, who was nearby, testified that when Swift put his bags down, he turned around "like he was going to punch the boy."

At this point, Woolridge-Jones pulled out a handgun, pointed the gun at Swift, and fired two shots. Swift fell to the floor, and Woolridge-Jones moved toward Swift and stood over him, pointing the gun at him. Swift appeared to kick at the gun, and the clip fell out of the gun and onto the floor. Swift got up and limped away. Woolridge-Jones picked up the clip, put it back in the gun, and ran after Swift. In the surveillance footage, Swift did not appear to be armed, and a nearby witness testified that a youth matching Woolridge-Jones' description was the only one with a gun.

Meanwhile, the sound of gunshots caused bystanders to flee. Piggie, Moten-Roddy, and Veland ran to a set of escalators. Piggie and Moten-Roddy boarded the ascending escalator before Veland, who soon stepped past Piggie. Surveillance footage showed that just before Veland stepped onto the escalator, she appeared to limp and looked down at her feet. She testified that she looked at her feet because it felt like her body was "on fire."

As Piggie, Moten-Roddy, and Veland went up the escalator, Swift ran toward the escalators, followed by Woolridge-Jones. Woolridge-Jones raised his arm and fired two more shots toward Swift. Swift fell to the floor at the bottom of the escalators.

As Swift fell to the floor, Moten-Roddy and Veland arrived at the top of the escalator. Piggie, only halfway up the escalator, took a handgun out of his jacket and extended his right arm over the railing, in the direction of Woolridge-Jones, and

fired shots. When Piggie neared the top of the escalator, he appeared to stow the gun in his coat.

Swift then limped away from the escalators and collapsed. He later died at a hospital.

Veland testified that after she exited the mall, she realized she had been shot and sought medical treatment. It revealed that her left leg was grazed by a bullet and that a bullet had lodged in her right lower leg. At the time of trial, the bullet remained in Veland's leg.

### (b) Forensic Evidence

The forensic pathologist who performed the autopsy on Swift testified. She opined that Swift's cause of death was blood loss due to a combination of two gunshot wounds, one that entered his left buttocks and one that entered his lower back or hip area.

The jury heard testimony by a senior forensic technician and firearm and toolmark examiner with the police department. She testified that investigators at the scene recovered multiple shell casings ejected from two different weapons. These included two .40-caliber shell casings where Woolridge-Jones fired his initial shots and two more .40-caliber shell casings near the escalators, all ejected from the same weapon. Along the escalators, investigators also recovered three 9-mm shell casings, which had been ejected from another weapon.

Investigators did not recover any firearms inside the mall or from Swift; nor did they find the gun Woolridge-Jones had used.

### (c) Woolridge-Jones' Statements to Police

Police identified Woolridge-Jones as a shooter in the incident and arrested him at his home the next day. There was testimony that while exiting the home in custody, Woolridge-Jones cried and stated, "'It was an accident. It was an accident. It was an accident. He pulled a gun on me.'" He also told officers, "'I didn't mean to kill that man.'" After advising

Woolridge-Jones of his rights, detectives interviewed him. Portions of the interrogation video were published to the jury.

During the interview, Woolridge-Jones told police that Swift threatened to follow him out to his car in the parking lot and shoot him. Woolridge-Jones also claimed Swift threatened to kill him. Woolridge-Jones told the detectives that he would not let anyone kill his brother and that he would die before allowing his brother to die. He told investigators that he kept a gun on him for protection and that he believed everyone should.

Woolridge-Jones admitted that he shot Swift and made several statements about the moments surrounding the shooting. Woolridge-Jones said he showed Swift the gun and told him to get back, but Woolridge-Jones said he had to shoot because Swift started grabbing for something. He similarly stated, "[Swift] started grabbing something . . . '[s]o I shot him.'" Woolridge-Jones also stated, "'[Swift] tried to shoot me. I shot him before he could shoot me.'" Woolridge-Jones admitted that he fired a total of three or four shots. Woolridge-Jones also stated that that he tried to aim below Swift's waist when he shot. He described the incident as an "out-of-body" experience and denied following Swift after the initial shots.

### (d) Expert Testimony Excluded

#### (i) Motion in Limine

Prior to trial, the district court sustained the State's motion in limine to exclude the trial testimony of licensed psychologist Colleen Conoley, Ph.D., who had evaluated Woolridge-Jones. The State expected Conoley to testify about Woolridge-Jones' state of mind during the shooting. This expectation was based on Conoley's testimony and report received as evidence at an earlier hearing on a motion to transfer the case to juvenile court. According to that evidence, Conoley opined that because of past gun-related trauma, when Woolridge-Jones fired the initial shot at the mall, it put him in a state of "peritraumatic dissociation, with depersonalization and peritraumatic amnesia."

The State suggested that Conoley's testimony was not relevant and that even if relevant, it was not admissible relevant evidence under Neb. Evid. R. 403, Neb. Rev. Stat. § 27-403 (Reissue 2016). The State also submitted that Conoley's testimony was not admissible expert testimony pursuant to Neb. Evid. R. 702, Neb. Rev. Stat. § 27-702 (Reissue 2016), because it would not assist the trier of fact to understand the evidence or determine a factual issue.

The district court sustained the motion in limine. For purposes of the motion, the district court assumed sufficient foundation, and it found that Conoley qualified as an expert. However, the district court determined that Conoley's testimony would not assist the trier of fact in understanding the evidence or determining a controverted factual issue.

### (ii) Offer of Proof

During trial, Woolridge-Jones made an offer of proof outside the presence of the jury, seeking admission of Conoley's testimony. The State stipulated that Conoley qualified as an expert witness, and Conoley testified for purposes of the offer of proof. Conoley opined that Woolridge-Jones experienced symptoms of peritraumatic dissociation "in regards to" the incident at the mall.

Conoley defined peritraumatic dissociation as "disintegration of information processing" that occurs "at the time of trauma or immediately surrounding it." She further explained:

> So typically the brain will simultaneously process sensory information, integrates it into a reasonable time — or temporal processing is what we call it — and integrates decision-making and information interpretation.
>
> Dissociation means that these processes are no longer integrated, and so the most common of these symptoms would be what we refer to as depersonalization and derealization.
>
> And depersonalization is the phenomenon of either an out-of-body experience or watching yourself do

something or distortions and how your body feels or what it looks like. . . .

Derealization is when the world around them seems distorted or unreal for some reason as in a cartoon or things in space aren't where they should be type of phenomenon.

Their dissociative symptoms are lapses in temporal processing, not being able to judge time or things not happening according to schedule . . . . And the other would be — and this is a little bit more rare, but a dissociative amnesia type of episode.

When asked to explain "autonomic response as it relates to peritraumatic dissociation," Conoley testified that parts of the brain can function while other parts are unaware of those functions. According to Conoley, "in times of severe fear, . . . parts of the brain within the limbic system, specifically the amygdala, can hijack the rest of the brain and operate on [their] own." She elaborated, "[I]t can shut down pathways to the frontal lobes, which means that there is no access to decision-making, thought processing, or general awareness of what the limbic system is doing in certain cases." In situations of heightened stress or threat, Conoley continued, the amygdala "will hyper-focus and put all of the attention on where it thinks the threat is most likely to come from" and the brain "will take a tunnel-vision approach where nothing else is being processed."

Conoley testified that peritraumatic amnesia is a symptom of peritraumatic dissociation. She explained that those who exhibit peritraumatic amnesia would not have the sensation that they had forgotten something; instead, they would not know that something happened until they were "confronted with their memory of events compared to what could be seen on something like a video." According to Conoley, this is a sign that the amygdala and the limbic system were "the only part[s] of his brain" that were processing information during the event. Conoley further elaborated that "the brain doesn't

put in a placeholder saying, 'This information is missing.' It likes to integrate. It likes to have explanations. It pieces things together."

Conoley identified several reasons why she believed Woolridge-Jones had experienced peritraumatic dissociation. She relied in part on his statements to police that he had an out-of-body experience. Conoley acknowledged that Woolridge-Jones also told her he felt like he was still in control during the shooting; but she testified that this did not negate her conclusion that Woolridge-Jones experienced peritraumatic dissociation. She specified:

[T]hat tells me two things: One is that his memory is based on his perception, and so his perception at the time was that even though he left his body, he felt like he was in control, and so that is how his brain integrated that information.

The other thing that [it] tells me is that . . . there wasn't any added embellishment or drama, or, you know, he wasn't making this more dramatic than it needed to be. But that would be his perception because you can only remember what you perceived.

. . . .

. . . He perceived that he was in control, and so his limbic system was in control, but his thought processing was not.

Conoley also cited "indications that [Woolridge-Jones] was missing time, that he didn't remember pursuing [Swift] or running anywhere else, and that he was very shocked by the idea that he would do that because, in his autobiographical memory, he was defending himself and then running from the threat." Conoley further characterized the episode as consistent with peritraumatic amnesia because, rather than forgetting the entire incident, Woolridge-Jones' "episode was under 30 seconds" and he lacked "a consolidated memory because his prefrontal cortex was not encoding [the] information."

Conoley testified that "the firing of the gun" was the precipitating event for the peritraumatic dissociation and that Woolridge-Jones' history made him particularly vulnerable to that state. For example, Conoley cited Woolridge-Jones' prior history of gun-related trauma. Conoley also noted that Woolridge-Jones used marijuana chronically from an early age, making "depersonalization and derealization mechanisms more likely to occur."

Conoley disclaimed diagnosing Woolridge-Jones with a dissociative disorder or a specific pathology associated with peritraumatic dissociation. Instead, she diagnosed him with "unspecified trauma disorder," because "he does not have enough symptoms to categorize him as having any type of dissociative disorder." She testified that "peritraumatic dissociation is not necessarily pathological in and of itself. It is a response in the moment to trauma that can happen to anyone."

Conoley testified that her conclusions were based on her interview with Woolridge-Jones, the interrogation by police, surveillance video from the mall, and professional literature on the subject. As to this latter resource, Conoley recounted that dissociation had been observed and discussed for over 100 years. More recently, she testified, research found that when police officers fired a firearm for the first time in the line of duty, there was a dissociative symptom 90 percent of the time, the most common symptoms being derealization and depersonalization. Regarding the police interview, Conoley testified that Woolridge-Jones' statements to police were the "most pure version of what he remembers because, after he was shown the footage, from that point on, his memory became contaminated because he then knew that something was wrong with his recount."

Some of Conoley's testimony pertained to whether Woolridge-Jones' statements to her and to police were exaggerated or feigned. Conoley acknowledged that Woolridge-Jones' statements to her and to police about an out-of-body experience could be self-serving. But Conoley also testified that

malingering or validity scales were built into the personality measures she employed with Woolridge-Jones and that "there was no indication that he was trying to exaggerate or feign any type of condition." Conoley continued:

> And then also . . . I rereviewed the literature base to look for ways to assess for malingering and claims of amnesia because, obviously, there would be a benefit to [Woolridge-Jones] to have this explained away. And other than seeing that there would be a benefit, none of the other factors applied.
>
> There were no indications of exaggeration. He didn't report phenomen[a] that were inconsistent with anything that's been observed. He didn't develop any type of fantasy that was based on what we've all seen [o]n TV where people have multiple personalities or black out or, you know, it all went red. He didn't engage in any of those, I guess, types of behaviors or reports.

Conoley agreed that this was true both in Woolridge-Jones' police interview and in his interview with Conoley.

At the conclusion of the offer of proof, the district court excluded Conoley's testimony pursuant to §§ 27-403 and 27-702. It found that Conoley was qualified as an expert witness. However, unlike its earlier ruling that assumed foundation, the district court specifically found that there was not sufficient and proper foundation for her to testify that Woolridge-Jones' own act of firing a gun resulted in peritraumatic dissociation with depersonalization and peritraumatic amnesia. And even if foundation was sufficient, Conoley's opinion, the district court found, would not assist the jury as the trier of fact. Further, even if there was marginal relevance to her opinion, the district court stated it would be excluded because its probative value was substantially outweighed by the danger of unfair prejudice.

### 3. Verdicts and Sentencing

The jury was instructed on the charged offenses. For the first degree murder charge, this included an instruction on the

lesser-included offenses of second degree murder and manslaughter. As for the charge of second degree assault, the jury was instructed that the elements required Woolridge-Jones to have intentionally or knowingly caused bodily injury to Veland. The jury instructions explained that the homicide and assault charges were the predicate felonies for the charges of use of a deadly weapon to commit a felony. They further directed that when "one attempts to assault a certain person, but by mistake or inadvertence assaults a different person, the crime, if any, so committed is the same as though the person originally intended to be assaulted, had been assaulted." The jury was also advised that if Woolridge-Jones acted in self-defense or defense of another, it must acquit him.

The jury found Woolridge-Jones guilty of the lesser-included offense of second degree murder, second degree assault, and two counts of use of a deadly weapon to commit a felony. The district court accepted the verdicts and entered conviction. It ordered a presentence report, which included Conoley's report.

At the sentencing hearing, the district court noted that it had considered the presentence report and the appropriate statutory factors, as well as Woolridge-Jones' age, mentality, education and experience, social and cultural background, past criminal record or record of law-abiding conduct, the motivation for the offense, the nature of the offense, and the amount of violence involved. The district court recounted that Woolridge-Jones was 17 years old at sentencing and that surveillance footage in evidence showed him discharging a firearm at Swift, pursuing Swift while continuing to shoot, and shooting Veland in the process. The district court further noted that Woolridge-Jones had been in the criminal justice system since the age of 13, serving juvenile probation between the ages of 14 and 15. The district court observed that while incarcerated for the current offense, Woolridge-Jones had incurred seven disciplinary lockdown penalties, six of them for fighting. The district court also acknowledged

that testing measures placed Woolridge-Jones in the very high risk category for community-based supervision and found him to be at a very high risk to reoffend.

The district court sentenced Woolridge-Jones to 50 to 80 years' imprisonment for second degree murder and 10 to 20 years' imprisonment for second degree assault, to be served concurrently. For each of the two counts of use of a deadly weapon to commit a felony, the district court sentenced Woolridge-Jones to the mandatory minimum 5 to 10 years' imprisonment, to be served consecutively to each other and to the sentences imposed for murder and assault.

Woolridge-Jones appeals.

## II. ASSIGNMENTS OF ERROR

Woolridge-Jones assigns (1) that the district court erred in excluding Conoley's expert opinion testimony; (2) that the evidence was insufficient to sustain his convictions for second degree murder, second degree assault, and two counts of use of a deadly weapon to commit a felony; and (3) that the district court erred in imposing excessive sentences.

## III. STANDARD OF REVIEW

[1] An appellate court reviews a trial court's ruling to admit or exclude an expert's testimony for abuse of discretion. *State v. Braesch*, 292 Neb. 930, 874 N.W.2d 874 (2016).

[2] In reviewing a criminal conviction for a sufficiency of the evidence claim, whether the evidence is direct, circumstantial, or a combination thereof, the standard is the same: An appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact. *State v. Stack*, 307 Neb. 773, 950 N.W.2d 611 (2020). The relevant question for an appellate court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

[3,4] Absent an abuse of discretion by the trial court, an appellate court will not disturb a sentence imposed within the statutory limits. *State v. Johnson*, 308 Neb. 331, 953 N.W.2d 772 (2021). An abuse of discretion occurs when a trial court's decision is based upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id.*

## IV. ANALYSIS

### 1. Expert Testimony

Woolridge-Jones contends that the district court erred in excluding Conoley's expert opinion testimony that he experienced an episode of peritraumatic dissociation after firing the initial shot. We discern no such error.

As they did in the district court, the parties dispute whether Conoley's testimony was admissible expert testimony pursuant to § 27-702. Perhaps, below, the State could have challenged the admission of Conoley's expert testimony by invoking *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993), and *Schafersman v. Agland Coop*, 262 Neb. 215, 631 N.W.2d 862 (2001) (*Daubert/Schafersman*). See, e.g., *State v. Gleaton*, 316 Neb. 114, 3 N.W.3d 334 (2024). Under the *Daubert/Schafersman* framework, the trial court acts as a gatekeeper to ensure the evidentiary relevance and reliability of an expert's opinion. *Gleaton, supra*. The *Daubert/Schafersman* framework provides several nonexclusive factors a trial court may consider in assessing reliability. See *Gleaton, supra*. Here, the State did not appear to specifically address those factors before the district court, and the district court did not rule on reliability grounds. Likewise on appeal, neither party addresses the reliability of Conoley's opinion under *Daubert/Schafersman*. Accordingly, we focus our analysis on the issues related to § 27-702 argued by the parties.

[5] Section 27-702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to

understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." And we have identified four preliminary questions that must be answered in order to determine whether an expert's testimony is admissible: (1) whether the witness qualifies as an expert pursuant to § 27-702; (2) whether the expert's testimony is relevant; (3) whether the expert's testimony will assist the trier of fact to understand the evidence or determine a controverted factual issue; and (4) whether the expert's testimony, even though relevant and admissible, should be excluded in light of § 27-403 because its probative value is substantially outweighed by the danger of unfair prejudice or other considerations. See *State v. Greer*, 312 Neb. 351, 979 N.W.2d 101 (2022).

[6] In addition to the foregoing, we have also recognized that expert testimony should not be received if it appears the witness is not in possession of such facts as will enable him or her to express a reasonably accurate conclusion, as distinguished from mere guess or conjecture. *Scurlocke v. Hansen*, 268 Neb. 548, 684 N.W.2d 565 (2004). Even if an expert possesses specialized knowledge, his or her testimony is properly excluded if the record does not support a finding that the expert had a sufficient foundation for his or her opinion. See *id.*

In this case, the district court's ruling after the offer of proof found that Conoley qualified as an expert under § 27-702, but it determined that her testimony was inadmissible based on any one of several other reasons. According to the district court, there was not sufficient and proper foundation for Conoley to testify that Woolridge-Jones' own act of firing a gun resulted in peritraumatic dissociation. The district court also found that even if foundation were sufficient, Conoley's opinion would not assist the trier of fact. Further, the district court stated that even if Conoley's opinion had any relevance, its probative value was substantially outweighed by the danger of unfair prejudice.

On appeal, Woolridge-Jones argues that Conoley's opinion would have assisted the trier of fact in determining whether Woolridge-Jones acted with deliberate and premeditated malice for purposes of the first degree murder charge, see Neb. Rev. Stat. § 28-303 (Cum. Supp. 2022), or acted intentionally for purposes of the lesser-included offense of second degree murder, see Neb. Rev. Stat. § 28-304 (Reissue 2016). Because Woolridge-Jones was convicted of second degree murder, we focus on whether Conoley's testimony would have assisted the jury in determining whether Woolridge-Jones acted with the requisite intent to be found guilty of that crime.

Woolridge-Jones argues that Conoley's opinions that he experienced depersonalization and derealization would have been "especially relevant to aid the jury" in determining whether he acted intentionally. Brief for appellant at 19. We disagree that the district court abused its discretion by concluding that Conoley's opinions concerning depersonalization and derealization would not have assisted the trier of fact.

On this point, we are guided by *State v. Braesch*, 292 Neb. 930, 874 N.W.2d 874 (2016). In *Braesch*, the defendant was tried for first degree murder. The district court excluded an expert's opinion that the defendant's bipolar disorder limited his ability to make good decisions and to effectively regulate his behavior. On appeal, we concluded the expert's testimony was properly excluded in part because it would not assist the trier of fact. We observed that the State had the burden to prove that the defendant killed another purposely and with deliberate and premeditated malice. However, the expert's opinion could not be applied to the facts of the case because it did not speak to whether the disorder prevented the defendant from "deliberat[ing] and premeditat[ing] the killing," as we defined those terms. *Id.* at 952, 874 N.W.2d at 890. We said that the expert's opinion that the defendant's "bipolar . . . disorder limited his ability to effectively regulate his behavior was too vague to assist the fact finder" in deciding whether the defendant deliberated or premeditated the killing.

*Id.* at 952, 874 N.W.2d at 891. We explained that even if the defendant's "decisionmaking" was impaired, the expert's testimony did not show how that impairment prevented the defendant from forming the statutory mental state for first degree murder. *Id.*

Similarly, here, we find no abuse of discretion in the district court's conclusion that opinions regarding Woolridge-Jones' experiencing depersonalization, derealization, or even peritraumatic amnesia would not have assisted the jury in determining whether he acted with the requisite intent to be convicted of second degree murder. A person commits second degree murder by causing the death of another person intentionally, but without premeditation. § 28-304. In the context of a criminal statute, we have said "intentionally" means willfully or purposely, and not accidentally or involuntarily. See *State v. Morton*, 310 Neb. 355, 966 N.W.2d 57 (2021). As we have noted, in her testimony, Conoley characterized depersonalization as the phenomenon of an out-of-body experience or the experience of distortions in how a person's body feels or what it looks like. She described derealization as when things appear distorted or unreal to a person. She asserted that peritraumatic amnesia involved a lack of memory of brief periods. She did not, however, offer any explanation as to how Woolridge-Jones' experiencing any of these phenomena would have affected his ability to act willfully or purposely as opposed to accidentally or involuntarily. On this basis, we find that the district court did not abuse its discretion in determining that Conoley's opinions that Woolridge-Jones experienced these phenomena would not have aided the jury in deciding the issue of intent.

Although less of a focus of Woolridge-Jones' arguments on appeal, we acknowledge that in the offer of proof, Conoley also offered some testimony regarding the relationship between peritraumatic dissociation and the function of the brain. Specifically, Conoley testified that when a person undergoes peritraumatic dissociation, "parts of the brain within the

limbic system, specifically the amygdala, can hijack the rest of the brain and operate on [their] own." She further explained, "[I]t can shut down pathways to the frontal lobes, which means that there is no access to decision-making, thought processing, or general awareness of what the limbic system is doing in certain cases." For reasons similar to those discussed above, we find that the district court acted within its discretion to find that these opinions would not assist the trier of fact. First, Conoley certainly referred to operation of the "limbic system" to the exclusion of other parts of the brain, but she did not offer any explanation to assist lay jurors in deciding whether "what the limbic system is doing" would be willful or purposeful, rather than accidental or involuntary. Additionally, all of the testimony summarized above was framed in terms of processes that *can* occur when a person undergoes peritraumatic dissociation. This testimony, however, did not provide the jury with a basis to determine whether Woolridge-Jones actually experienced these processes in this case.

We recognize that Conoley also opined that while Woolridge-Jones' "limbic system was in control, . . . his thought processing was not." Although this type of testimony arguably comes closer to speaking to whether Woolridge-Jones acted with the requisite intent, it runs into other problems, as we will explain.

Conoley largely based her opinion that Woolridge-Jones experienced peritraumatic dissociation after he fired the first shots on Woolridge-Jones' account of the incident, particularly his claims that he felt like he was outside of his body and that he did not remember chasing Swift down after he fired the initial shots. In *State v. Braesch*, 292 Neb. 930, 950, 874 N.W.2d 874, 890 (2016), in the course of explaining that the district court did not abuse its discretion in finding the expert testimony unreliable, we observed that the district court was "justifiably concerned" that the expert primarily relied on the defendant's self-reporting of his bipolar symptoms, when the defendant had an incentive to falsify

or exaggerate those symptoms. As Conoley herself acknowledged, Woolridge-Jones would have had similar incentives to minimize his culpability for Swift's death.

And even if the fact that Conoley relied on Woolridge-Jones' self-reporting could be overlooked, we cannot ignore that Conoley seems to have credited Woolridge-Jones' self-report only to the degree that it buttressed her conclusion: Conoley largely accepted Woolridge-Jones' account, but she dismissed his statement in his interview with her that "he was still in control, but felt like he had left his own body," as Woolridge-Jones' mere perception that he was in control. According to Conoley, Woolridge-Jones would have perceived that he was in control because his "limbic system was in control." Although Conoley did explain the testing measures that led her to believe Woolridge-Jones' overall account, she did not meaningfully explain why she dismissed his statement that he was in control as mere perception, not reality. In our view, Conoley's conclusory explanation for why she largely based her opinion on Woolridge-Jones' self-reporting, but dismissed his self-reporting when it did not support her conclusion, reveals an absence of adequate foundation for her opinion regarding Woolridge-Jones' "control" after the initial shots were fired. See *Scurlocke v. Hansen*, 268 Neb. 548, 684 N.W.2d 565 (2004).

Having concluded that the district court did not abuse its discretion for the reasons discussed above, we need not address the other grounds for exclusion articulated by the district court. See *State v. Huston*, 298 Neb. 323, 903 N.W.2d 907 (2017) (appellate court is not obligated to engage in analysis that is not necessary to adjudicate case and controversy before it). With this evidentiary issue resolved, we turn to Woolridge-Jones' remaining assignments of error.

## 2. Sufficiency of Evidence

Woolridge-Jones assigns that the evidence was not sufficient to support his convictions. His arguments focus on second degree murder and second degree assault, and we

understand him to suggest that without sufficient proof of these underlying felonies, the evidence was also insufficient to support his convictions for use of a deadly weapon to commit a felony. See Neb. Rev. Stat. § 28-1205 (Reissue 2016). We are unpersuaded.

[7] We begin with Woolridge-Jones' contention that the evidence was insufficient to convict him of second degree murder. As we observed above, § 28-304 provides that a person commits second degree murder by causing the death of another person intentionally, but without premeditation. Again, we have held that in the context of a criminal statute, "intentionally" means willfully or purposely, and not accidentally or involuntarily. See *State v. Morton*, 310 Neb. 355, 966 N.W.2d 57 (2021). A trier of fact may infer that the defendant intended the natural and probable consequences of the defendant's voluntary acts. *Id*.

Evidence at trial, primarily surveillance footage and forensic evidence, supported the jury's finding that Woolridge-Jones intentionally killed Swift and thereby committed second degree murder. According to that evidence, during an argument with Swift, Woolridge-Jones produced a handgun, pointed it at Swift, and fired two shots. Swift fell to the floor, and Woolridge-Jones moved and stood over Swift, still pointing the gun at him. When the clip fell out of the gun, Woolridge-Jones picked it up and put it back in. He then ran after Swift, who had limped away. During this pursuit, Woolridge-Jones fired toward Swift twice more. Two of Woolridge-Jones' shots hit Swift, killing him. There was no evidence that Swift was armed. Based on this sequence of events, the jury could infer that Woolridge-Jones intended the natural and probable consequences of shooting at Swift multiple times: Swift's death.

Woolridge-Jones highlights other evidence, such as his statements to police that he believed Swift had pulled out a gun, that he aimed below Swift's waist, and that he acted to protect his brother amid threats by Swift. To the extent

Woolridge-Jones argues that the evidence supported at most a manslaughter conviction, see Neb. Rev. Stat. § 28-305(1) (Reissue 2016), or that his actions were justified by self-defense or defense of another, see Neb. Rev. Stat. §§ 28-1409 and 28-1410 (Reissue 2016), he asks us to make credibility determinations, reweigh the evidence, and reach our own conclusion. But that was the jury's role, not ours. See *State v. Stack*, 307 Neb. 773, 950 N.W.2d 611 (2020) (appellate court does not resolve conflicts in evidence, pass on credibility of witnesses, or reweigh evidence; such matters are for finder of fact). Our inquiry is whether, viewing the evidence in the light most favorable to the prosecution, a rational jury could have found the essential elements of second degree murder beyond a reasonable doubt and that the evidence did not support the justification of defense. See *id.* In finding Woolridge-Jones guilty of second degree murder, the jury apparently discredited his version of events. And as recounted above, there was sufficient evidence to support the jury's finding that Woolridge-Jones' actions satisfied the elements of second degree murder and that he did not act in defense. Woolridge-Jones' arguments to the contrary lack merit.

As for second degree assault, Woolridge-Jones makes two alternative sufficiency of the evidence arguments: first, that there was insufficient evidence that he shot Veland at all, and second, that even if he did shoot her, the elements of second degree assault were not satisfied. We find neither argument has merit.

First, we are unconvinced by Woolridge-Jones' contention that the evidence was insufficient to prove that he shot Veland. He points out that Veland did not realize she had been shot until after she left the mall and that a bullet was not recovered from her leg to link her injuries to Woolridge-Jones' gun. Woolridge-Jones suggests instead that it was Piggie who shot Veland. We disagree with Woolridge-Jones and conclude that the jury rationally could have found that Woolridge-Jones shot Veland.

There was circumstantial evidence from which a rational trier of fact could find that shots fired by Woolridge-Jones, not Piggie, struck Veland and injured her legs before she reached the escalator. Veland was nearby when Woolridge-Jones fired his initial shots. Afterward, surveillance footage viewed by the jury showed Veland fleeing. As she approached the escalator, she appeared to limp and looked down at her feet. Veland explained that she did so because it felt like her body was "on fire." Shell casings at the scene supported the theory that only Woolridge-Jones had fired shots at this point. Although Piggie fired shots from the escalator, by that time, Veland was several steps above him, and as Piggie fired, he pointed his gun away from Veland. Shell casings recovered near the escalator suggested that this was the only time Piggie discharged his gun and that he could not have shot Veland.

Second, we are also unpersuaded by Woolridge-Jones' position that even if he did shoot Veland, the elements of second degree assault were not satisfied. Consistent with the jury instructions here, one of the ways a person can commit second degree assault is by "[i]ntentionally or knowingly caus[ing] bodily injury to another person with a dangerous instrument." See Neb. Rev. Stat. § 28-309(1)(a) (Reissue 2016). The jury was also instructed on the doctrine of transferred intent, that is, if it found that Woolridge-Jones intended to cause bodily injury to Swift but injured Veland by mistake, the intent to injure Swift would function as the intent to injure Veland, even though she was not Woolridge-Jones' target. See *State v. Morrow*, 237 Neb. 653, 467 N.W.2d 63 (1991) (holding evidence sufficient to support second degree murder conviction where defendant pointed gun at neck of person with whom he had exchanged angry words, fired, and missed, but hit and killed another person). As we have explained, there was evidence to support the jury's findings that Woolridge-Jones intentionally killed Swift without the justification of self-defense or defense of another and that in the process, he shot Veland too. Under the doctrine of transferred intent, this

evidence was sufficient for the jury to find that Woolridge-Jones intentionally caused bodily injury to Veland with a dangerous instrument.

For these reasons, we conclude that the evidence at trial was sufficient to support Woolridge-Jones' convictions for second degree murder, second degree assault, and use of a deadly weapon to commit a felony.

### 3. Excessive Sentences

Finally, Woolridge-Jones assigns that the district court erred in imposing excessive sentences. He does not dispute that he was sentenced within statutory limits, but he argues that the district court erred by failing to account for the mitigating effects of Woolridge-Jones' young age, limited education, difficult upbringing, and brief criminal history. Woolridge-Jones also emphasizes his mental health struggles and his efforts toward avoiding future criminal behavior, such as taking responsibility for the offenses and continuing his education.

[8-10] Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed. *State v. Stack*, 307 Neb. 773, 950 N.W.2d 611 (2020). In determining a sentence to be imposed, relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime. *Id.* The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id*.

The record reflects that the district court considered the factors enumerated above, along with other information in

the presentence report and statements at the sentencing hearing. Thus, it assessed the mitigating factors proffered by Woolridge-Jones. But in addition to those mitigating factors, the district court considered that Woolridge-Jones had contacts with the criminal justice system from a young age; that in the present case, Woolridge-Jones chased Swift through a shopping mall while firing shots, hitting both Swift and Veland; and that evaluations showed a very high risk that Woolridge-Jones would reoffend. Although the district court did not specifically address every sentencing factor in sentencing Woolridge-Jones, we have rejected the notion that a court does not adequately consider sentencing factors when it does not discuss each one of them during the sentencing hearing or in its sentencing order. See *State v. Blaha*, 303 Neb. 415, 929 N.W.2d 494 (2019). Based on our review of the record and the relevant considerations, we conclude that the district court did not abuse its discretion in sentencing Woolridge-Jones.

## V. CONCLUSION

We find no merit to Woolridge-Jones' contentions. We therefore affirm.

Affirmed.