IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. ORELLANA

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

JOSE E. ORELLANA, APPELLANT.

Filed June 17, 2025.    No. A-24-846.

Appeal from the District Court for Dodge County: GEOFFREY C. HALL, Judge. Affirmed as modified.

Grace C. Boothe-Hanna, of Yost, Lamme, Hillis, Mitchell, Schulz, Hartmann, Wilson & Borgmann, P.C., for appellant.

Michael T. Hilgers, Attorney General, and Jacob M. Waggoner for appellee.

RIEDMANN, Chief Judge, and MOORE and ARTERBURN, Judges.

ARTERBURN, Judge.

## I. INTRODUCTION

Following a bench trial, Jose E. Orellana was found guilty of two counts of first degree sexual assault of a child and one count of first degree sexual assault. He received an aggregate sentence of 115 to 130 years' imprisonment. Orellana appeals and asserts that his trial counsel was ineffective in two respects. He also argues that his sentences are excessive. For the reasons that follow, we determine that both claims of ineffective assistance of counsel fail and that Orellana's sentences are not excessive. However, we find that the court plainly erred in its application of credit for time served. We therefore affirm Orellana's convictions and sentences as modified.

- 1 -

## II. BACKGROUND

On February 27, 2023, the State filed an information in the district court for Dodge County charging Orellana with four counts of first degree sexual assault of a child, one count of production of child pornography, one count of first degree sexual assault, six counts of possession of child pornography, one count of child abuse, and one count of unlawful intrusion. On July 15, 2024, an amended information was filed, charging Orellana with four counts of first degree sexual assault of a child, a Class IB felony; one count of production of child pornography, a Class ID felony; and one count of first degree sexual assault, a Class II felony. Prior to trial, the State moved to dismiss count 5, the child pornography charge, which the court granted. Orellana waived his right to a jury trial, and a bench trial was held in August 2024.

At trial, the State adduced testimony from S.L., the victim in this case. S.L. was born in March 2000 and lived in Nebraska for most of her adolescence. Her mother, Guadalupe L., dated and lived with Orellana for several years. Although Guadalupe and Orellana never married, S.L. viewed Orellana as a father figure and sometimes referred to him as her stepfather.

S.L. testified that in 2008, she lived in Hooper, Nebraska, with her mother, her brother, and Orellana. S.L. testified that at this time, Orellana began sexually assaulting her. She described one particular incident where she was playing a video game with Orellana when he suddenly began touching her in a sexual manner. S.L. alleged that Orellana touched her chest and her vagina and inserted his fingers and penis into her vagina. As a result of this incident, S.L. felt "horrible" and experienced "confusion." She testified that after this event, Orellana became "dominant" over her.

In 2012, the family moved to Scribner, Nebraska, and began living in a recreational vehicle (RV). S.L. recalled an incident when she was sleeping in the RV and woke up to Orellana touching her and inserting his penis into her vagina. S.L. testified that after this incident, Orellana became more aggressive and abusive.

That same year, the family moved out of the RV and into a home in Nickerson, Nebraska. S.L. recalled that when they first moved in, there was no furniture in her bedroom. S.L. testified that at this time, Orellana had vaginal sex with her. S.L. recalled that her mother and brother were in the home during this incident, but in different rooms.

S.L. testified that when she was 14 years old, Orellana continued to "aggressively sexually abuse" her. She testified that her relationship with Orellana became more toxic and aggressive. As a result, she felt isolated and depressed.

In 2015, when S.L. was 15 years old, she became pregnant. S.L. testified that Orellana was the father because he was the only person who "would have sex with [her]." S.L. testified that when Orellana learned about her pregnancy, he was "really upset" and became more sexually aggressive. S.L. testified that her mother and Orellana wanted her to have an abortion and that she did not have a choice in the matter. S.L. alleged that sometime in 2016, her mother and Orellana took her to a Planned Parenthood clinic in Omaha, where she obtained an abortion.

S.L. became pregnant again in 2018 when she was 18 years old. S.L. testified that Orellana was the father because she "never had sex with anybody else." S.L. gave birth to her daughter, M.L., in June 2019. Orellana instructed S.L. not to list him as M.L.'s father on any official paperwork, and S.L. complied with these instructions. S.L. listed a fictitious name for M.L.'s father on a state paternity questionnaire.

S.L. testified that after M.L.'s birth, Orellana stopped engaging in sexual intercourse with her. In November 2020, S.L. and M.L. moved to Texas and lived with S.L.'s older sister, C.C. Orellana remained in Nebraska and was angered by S.L.'s departure.

In 2022, S.L. told C.C. about the abuse she endured, and C.C. encouraged S.L. to disclose the abuse to law enforcement. In March 2022, S.L. filed a report with the Dodge County Sheriff's Office. The report was forwarded to Investigator Ryan Smith. Because S.L. and M.L. were living in Texas, Smith contacted the Texas Department of Safety to coordinate interviews and buccal swabs for the investigation. Texas officers obtained buccal swabs from M.L., which were transferred to Nebraska via certified mail, and the Dodge County Sheriff's Office obtained buccal swabs from Orellana and S.L., who at some point traveled to Nebraska to assist in the investigation.

Smith testified that buccal swabs are a method of collecting DNA and described the process as follows:

> We take a Q-tip out of a sealed plastic package. We use that Q-tip, run it on the inside of the mouth, on the mouth of the inside cheek of the person we're trying to get the DNA from while we are wearing gloves. And, then, when we're done with the swab of the inside of the cheek, we place that buccal swab inside a cardboard box.

After this process was conducted on each buccal swab in this case, the swabs were placed into an evidence bag and stored in an evidence locker at the Dodge County Sheriff's Office.

The sheriff's office then requested the Nebraska State Patrol Crime Laboratory to conduct a DNA analysis on the buccal swabs. Once the DNA profiles were created, the sheriff's office requested the University of Nebraska Medical Center to conduct a paternity test. The results of the paternity test revealed that Orellana could not be excluded as the father of M.L. The report specifically states that "99.99% of falsely accused men unrelated to [Orellana] would be excluded as the father by the above tests." In other words, there is a 99.99 percent certainty that Orellana is the father of M.L.

Guadalupe testified that Orellana admitted to impregnating S.L. during both of S.L.'s pregnancies. Guadalupe also testified that Orellana specifically identified himself as M.L.'s father. When asked why she did not report Orellana's abuse of S.L. to the authorities, Guadalupe explained that she feared Orellana and that he often threatened her and hit her. S.L. testified that as a result of Orellana's abuse, she is depressed and unable to trust others.

After all the evidence was submitted, the court found Orellana guilty of counts 3 and 4, first degree sexual assault of a child both occurring "during or about 2015," and count 6, first degree sexual assault occurring in 2018. The court found Orellana not guilty of counts 1 and 2, which were also first degree sexual assault of a child charges alleged to have occurred in 2008, 2009, and 2012. The district court ordered a presentence investigation report (PSI) and scheduled the matter for sentencing.

Sentencing occurred on November 7, 2024. Arguments were presented to the court regarding the appropriate sentences to be imposed. Once the matter was submitted, the court made the following remarks:

> This Court has reviewed the [PSI] in this case. Further, I am aware of the facts involved in this case, the troubling facts which led to the conviction of the three counts as determined by this Court at trial.

This Court finds that the conduct of [Orellana] is very disturbing. Further, I am troubled by, sir, your lack of acceptance of responsibility in this case. I agree with the State that you have robbed this poor victim of her innocence. You have robbed this victim of her youth.

At a time that she should have been experiencing the carefree days of being a child, she was subjected to your repeated sexual assaults. Ultimately, you impregnated her and now she's raising a child fathered by you. To her credit, this victim has picked herself up and went on to make the best of her life. She has shown tremendous courage and resilience. However, your conduct can only be described as depraved, criminal, corrupt, deviant, and wrong. This Court cannot and will not allow or condone this type of conduct in any way, shape, or form.

In determining what sentence ought to be imposed upon [Orellana], the Court has considered the nature and circumstances of the crimes; the history, character, and condition of [Orellana]. I have considered the [PSI] and all statements received, including those made here in open Court today.

As such, I find that imprisonment is necessary because, Number 1, the risk is substantial that during a period of probation, [Orellana] will engage in additional criminal conduct; Number 2, [Orellana] is in need of correctional treatment that can be provided most effectively by commitment to a correctional facility, and, finally, a lesser sentence will depreciate the seriousness of [Orellana's] crime or promote disrespect for the law.

The district court sentenced Orellana to 75 to 85 years' imprisonment on counts 3 and 4 and 40 to 50 years' imprisonment on count 6. The sentences for counts 3 and 4 were ordered to be served concurrently with one another. Count 6 was ordered to be served consecutively to the sentences for counts 3 and 4, resulting in an aggregate sentence of 115 to 130 years' imprisonment. Orellana received credit for 735 days of time served on each of his three sentences. Orellana appeals.

## III. ASSIGNMENTS OF ERROR

Orellana assigns, restated and reordered, that (1) his trial counsel was ineffective for failing to (a) obtain an independent DNA test of M.L. and (b) acquire S.L.'s medical records from Planned Parenthood, and (2) the district court imposed excessive sentences.

## IV. STANDARD OF REVIEW

Whether a claim of ineffective assistance of counsel may be determined on direct appeal is a question of law. *State v. Miranda*, 313 Neb. 358, 984 N.W.2d 261 (2023). In reviewing claims of ineffective assistance of counsel on direct appeal, an appellate court decides only whether the undisputed facts contained within the record are sufficient to conclusively determine whether counsel did or did not provide effective assistance and whether the defendant was or was not prejudiced by counsel's alleged deficient performance. *Id.*

Absent an abuse of discretion by the trial court, an appellate court will not disturb a sentence imposed within the statutory limits. *State v. Woolridge-Jones*, 316 Neb. 500, 5 N.W.3d 426 (2024). An abuse of discretion occurs when a trial court's decision is based upon reasons that

are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. *Id.*

Consideration of plain error occurs at the discretion of an appellate court. *State v. Mabior*, 314 Neb. 932, 994 N.W.2d 65 (2023). Plain error may be found on appeal when an error unasserted or uncomplained of at trial, but plainly evident from the record, prejudicially affects a litigant's substantial right and, if uncorrected, would result in damage to the integrity, reputation, and fairness of the judicial process. *Id.*

## V. ANALYSIS

### 1. INEFFECTIVE ASSISTANCE OF COUNSEL

Through different counsel, Orellana asserts that his trial counsel was ineffective in two respects. First, he argues that counsel was ineffective for failing to obtain an independent DNA test. Second, Orellana argues that counsel was ineffective for failing to "obtain records from Planned Parenthood . . . which could have refuted the allegations of Orellana impregnating [S.L.] at the age of fifteen." Brief for appellant at 13.

When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record; otherwise, the issue will be procedurally barred in a subsequent postconviction proceeding. *State v. Miranda, supra*. An ineffective assistance of counsel claim is raised on direct appeal when the claim alleges deficient performance with enough particularity for (1) an appellate court to make a determination of whether the claim can be decided upon the trial record and (2) a district court later reviewing a petition for postconviction relief to recognize whether the claim was brought before the appellate court. *Id.* When a claim of ineffective assistance of counsel is raised in a direct appeal, the appellant is not required to allege prejudice; however, an appellant must make specific allegations of the conduct that he or she claims constitutes deficient performance by trial counsel. *Id.*

Once raised, an appellate court will determine whether the record on appeal is sufficient to review the merits of the ineffective performance claims. *Id.* The record is sufficient if it establishes either that trial counsel's performance was not deficient, that the appellant will not be able to establish prejudice as a matter of law, or that trial counsel's actions could not be justified as a part of any plausible trial strategy. *Id.*

Generally, to prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the defendant must show that his or her counsel's performance was deficient and that this deficient performance actually prejudiced the defendant's defense. *State v. Swartz*, 318 Neb. 553, 17 N.W.3d 174 (2025). To show that counsel's performance was deficient, a defendant must show that counsel's performance did not equal that of a lawyer with ordinary training and skill in criminal law. *Id.* To show prejudice in a claim of ineffective assistance of counsel, the defendant must demonstrate a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. *Id.*

- 5 -

(a) Independent DNA Analysis

Orellana's first ineffective assistance claim alleges that his trial counsel was ineffective for "failing to engage an independent forensic DNA test to confirm the DNA test performed by law enforcement." Brief for appellant at 13. Orellana asserts that "it is possible that the DNA test results could have proven that Orellana was not the father of [M.L.]" *Id.* Orellana argues that such evidence would directly refute count 6, the first degree sexual assault charge.

To be considered by an appellate court, the party asserting the alleged error must both specifically assign and specifically argue the error in the party's initial brief. *State v. Garcia*, 315 Neb. 74, 994 N.W.2d 610 (2023). Where an appellant's brief contains conclusory assertions unsupported by a coherent analytical argument, the appellant fails to satisfy such requirement. *Id.* Moreover, in both the criminal and postconviction context, an appellate court will not ordinarily scour the record in search of facts that might support an appellant's claim. *Id.*

In this case, Orellana has broadly alleged that further investigation into the State's DNA testing could have *possibly* yielded evidence that he was not M.L.'s father. This allegation is conclusory and therefore insufficiently pled. Orellana bases his ineffective assistance claim on conjecture as to what additional test results would have shown. He does not provide any evidence or underlying facts that support the conclusion that further DNA testing would have shown he is not M.L.'s father.

Further, even if counsel had obtained a second DNA test, there is not a reasonable probability that the result at trial would have been different. The paternity test results offered by the State revealed that there was a 99.99 percent certainty that Orellana was M.L.'s father. There is nothing in the record or alleged in Orellana's brief to suggest that a second test would contradict these results. The State provided robust evidence as to the buccal swab procedure and the chain of custody for each swab. S.L. testified that Orellana was M.L.'s father because she had not engaged in sexual intercourse with anyone other than Orellana. Guadalupe testified that Orellana admitted to being M.L.'s father. For all these reasons, Orellana cannot establish prejudice on this claim. This assignment of error fails.

(b) Planned Parenthood Records

Orellana argues that his trial counsel was ineffective for failing to obtain records from Planned Parenthood "which could have refuted the allegations of Orellana impregnating [S.L.] at the age of fifteen." Brief for appellant at 13. He argues that had counsel attempted to obtain these records, "it is possible that said records would not exist," and this lack of evidence would refute counts 3 and 4. *Id.*

This argument suffers from the same defect as Orellana's first ineffective assistance claim: it is conclusory and therefore insufficiently pled. Orellana does not allege that the documents from Planned Parenthood do not exist. Rather, he argues that it is *possible* that they do not exist, and if so, their nonexistence would support his claim of innocence. This is not a sufficient allegation of ineffective assistance of counsel.

Moreover, Orellana cannot show a reasonable probability exists that but for counsel's failure to obtain these records, the result at trial would have been different. Even if the records did not exist, this would not definitively show that Orellana did not sexually assault S.L. during the time period alleged. An inability to locate the records could be interpreted as evidence that S.L.

never received an abortion from Planned Parenthood, but it could also be reasonably explained by routine document purging or misplacement due to the lapse of time. S.L. testified that the abortion at Planned Parenthood occurred in 2016, approximately 8 years prior to trial.

There was also abundant evidence to find Orellana guilty of counts 3 and 4. S.L. testified that at the age of 15, Orellana impregnated her. S.L. also testified that after Orellana learned about her pregnancy, he became more sexually aggressive toward her. This pattern of abuse did not end until S.L. gave birth to M.L. in June 2019. Guadalupe's testimony that Orellana admitted to impregnating S.L. when she was 15 reinforced S.L.'s account of Orellana's abuse. For all these reasons, Orellana cannot show he was prejudiced by this allegedly deficient performance. This claim fails.

## 2. EXCESSIVE SENTENCES

Orellana assigns that the district court erred in imposing excessive sentences. His argument is two-fold. First, he asserts that the court failed to consider all relevant factors when imposing his sentences. Second, he asserts that when compared to sentences of similar crimes, his sentences are "unjustly lengthy." Brief for appellant at 10.

Orellana was convicted of two counts of first degree sexual assault of a child, a Class IB felony, and one count of first degree sexual assault, a Class II felony. According to Neb. Rev. Stat. § 28-105 (Cum. Supp. 2024), a Class IB felony has a maximum sentence of life imprisonment. Neb. Rev. Stat. § 28-319.01(2) (Reissue 2016) prescribes a mandatory minimum sentence of 15 years' imprisonment for first degree sexual assault of a child, first offense. A Class II felony is punishable by up to 50 years' imprisonment and a minimum of 1 year imprisonment. § 28-105. Accordingly, Orellana's sentences of 75 to 85 years' imprisonment on counts 3 and 4 and 40 to 50 years' imprisonment on count 6 are within statutory limits.

Where a sentence imposed within the statutory limits is alleged on appeal to be excessive, the appellate court must determine whether a sentencing court abused its discretion in considering and applying the relevant factors as well as any applicable legal principles in determining the sentence to be imposed. *State v. Blaha*, 303 Neb. 415, 929 N.W.2d 494 (2019). In determining a sentence to be imposed, relevant factors customarily considered and applied are the defendant's (1) age, (2) mentality, (3) education and experience, (4) social and cultural background, (5) past criminal record or record of law-abiding conduct, and (6) motivation for the offense, as well as (7) the nature of the offense and (8) the amount of violence involved in the commission of the crime. *Id.* The appropriateness of a sentence is necessarily a subjective judgment and includes the sentencing judge's observation of the defendant's demeanor and attitude and all the facts and circumstances surrounding the defendant's life. *Id.*

There is nothing in the record to suggest that the district court did not consider all relevant sentencing factors. In fact, the court expressly stated at the sentencing hearing that it had considered the nature and circumstances of the crimes; Orellana's history, character, and condition; information in the PSI; and all statements made at the hearing. Further, the Nebraska Supreme Court has "reject[ed] the notion that a court does not adequately consider sentencing factors when it does not discuss each one of them during the sentencing hearing or in its sentencing order." *Id.* at 421, 929 N.W.2d at 501. Thus, to the extent that Orellana argues that the court was required to discuss each sentencing factor before announcing his sentence, we reject that notion.

As to Orellana's comparison of his sentence to what he deems are similar sentences, the law is clear. Sentencing courts are "under no obligation to conduct a comparative analysis of 'similar' cases—an inquiry that would be entirely impractical for trial courts to undertake." *State v. Morton*, 310 Neb. 355, 372, 966 N.W.2d 57, 70 (2021). Further, when reviewing a sentence, "an appellate court does not employ its discretion; instead, it reviews the sentence for *abuse* by the trial court of *its* discretion." *State v. Ezell*, 314 Neb. 825, 841, 993 N.W.2d 449, 461 (2023) (emphasis in original). Each sentence is tailored to the individual crimes and offenders before the sentencing court. *Id.* The fact that offenders in separate cases may have received shorter sentences has no bearing on our analysis of Orellana's sentences.

We acknowledge that Orellana's aggregate sentence is lengthy. But the crimes he was convicted of were serious, violent, longstanding, and reoccurring. The victim has suffered long-lasting trauma due to his actions. We cannot say that the district court imposed excessive sentences.

### 3. PLAIN ERROR

Although not raised by either party, we find plain error in the district court's application of credit for time served to count 6. Consideration of plain error occurs at the discretion of an appellate court. *State v. Mabior*, 314 Neb. 932, 994 N.W.2d 65 (2023). Plain error may be found on appeal when an error unasserted at trial, but plainly evident from the record, prejudicially affects a litigant's substantial right and, if uncorrected, would result in damage to the integrity, reputation, and fairness of the judicial process. *Id.*

Whether a defendant is entitled to credit for time served and in what amount are questions of law, subject to appellate review independent of the lower court. *State v. Nelson*, 318 Neb. 484, 16 N.W.3d 883 (2025). Neb. Rev. Stat. § 83-1,106(1) (Reissue 2024) states that "[c]redit against the maximum term and any minimum term shall be given to an offender for time spent in custody as a result of the criminal charge for which a prison sentence is imposed or as a result of the conduct on which such a charge is based." The amount of credit for time served to which a defendant is entitled is an absolute and objective number that is established by the record, and courts have no discretion to grant a defendant more or less credit than is established by the record. *State v. Nelson, supra*. When a trial court gives a defendant more or less credit than he is entitled to, that portion of the pronouncement of sentence is erroneous and may be corrected on direct appeal to reflect the accurate amount of credit as verified objectively by the record. *Id.*

Nebraska appellate courts have construed § 83-1,106 to require sentencing courts to apply all available credit, but only once. *State v. Nelson, supra.* In the past, Nebraska courts have used different procedures to apply credit depending upon whether the sentencing court imposed consecutive or concurrent sentences. *Id.* However, the Supreme Court recently clarified that when a court imposes multiple sentences contemporaneously, whether such sentences are ordered to be served consecutively or concurrently, all available credit for time served under § 83-1,106(1) is applied just once, to the aggregate of all terms imposed. *State v. Nelson, supra*.

In this case, the record shows that Orellana was held in custody for 735 days in connection with the criminal charges for which he was ultimately sentenced. According to the court's pronouncement of the sentences at the sentencing hearing, these 735 days were applied to each of

Orellana's three sentences. His sentences for counts 3 and 4 are concurrent with one another. His sentence for count 6 runs consecutive to those sentences.

Applying Orellana's credit for time served to each of his three sentences would result in a double application of credit. Orellana's aggregate sentence is 115 to 130 years' imprisonment. His concurrent sentences on counts 3 and 4 account for the first 75 to 80 years of imprisonment. His consecutive sentence on count 6 accounts for the latter 40 to 50 years of imprisonment. If credit for time served is applied to all three sentences, Orellana will have received two applications of credit for time served. His aggregate sentence would be reduced by 1,470 days, even though Orellana only spent 735 days in custody. Instead, only one application of time served should be made to Orellana's aggregate sentence.

Accordingly, we affirm the sentence of 40 to 50 years' imprisonment imposed on count 6 but modify the sentencing order to remove the grant of credit for time served to count 6. We affirm the sentences of 75 to 80 years' imprisonment on counts 3 and 4 and affirm the application of 735 days credit to counts 3 and 4. This modification results in a single application of credit for 735 days served to Orellana's aggregate sentence, as required by Nebraska law.

VI. CONCLUSION

We conclude that Orellana's assignments of ineffective assistance of trial counsel fail, and the district court did not impose excessive sentences. Having found plain error in the application of credit for time served on count 6, we direct the district court to modify the sentencing order accordingly. We otherwise affirm the judgment.

AFFIRMED AS MODIFIED.